# CHARLESTON.

RICHARDSON et al. v. RALPHSNYDER et al.

Submitted June 15, 1894.—Decided December 1, 1894.

1. CIRCUMSTANTIAL EVIDENCE—FRAUDULENT ASSIGNMENT—FRAUDULENT INTENT.

In showing the fraud necessary to impeach a conveyance, the fraudulent intent of the parties may be shown by the circumstances attending the transaction. Circumstantial evidence is not only sufficient, but is often the only evidence that can be adduced.

2. CONFLICTING EVIDENCE—REVERSAL.

Where the decree complained of is based upon depositions which are conflicting and contradictory in their character, so that it is difficult to determine on which side they preponderate, and hard to draw a proper conclusion therefrom, and different judges might reasonably disagree upon the facts proved, the appellate court will refuse to reverse the decree of the court below, although the testimony may be such that the appellate court might have rendered a different decree if it had acted upon the case in the first instance.

3. CREDITORS' PETITION—PRIORITIES OF CREDITORS

Creditors may come in by petition to a suit attacking a deed on the ground of fraud, and their priority will be determined by the date of filing their petition, unless they have other ground of priority.

4. FRAUDULENT ASSIGNMENT—CREDITORS—PRIORITIES OF CREDITORS.

Where an assignment of personal property is made in fraud of creditors, they, or any of them, may, in a court of equity, have the same set aside. The creditor who first files his bill obtains thereby a priority, and is entitled to be first paid from the proceeds of the sale of the property, if there are no valid prior liens.

5.   CREDITORS' PETITION — FRAUDULENT ASSIGNMENT — EQUITY PRACTICE.

> A creditor may file his petition in a cause pending which has for its object the vacation of a fraudulent conveyance, and, upon proper allegations, be made a party to the suit, and the bill, exhibits, answers, depositions, orders and decrees, and all the proceedings in said cause, may, upon proper prayer, be read as part of his petition.

W. W. BRANNON for appellant cited Code 1887, c. 125, s. 42; Starkie on Ev. (9th Ed.) 724; 6 W. Va. 274; 75 Va. 522; 84 Va. 341; 37 W. Va. 577.

D. M. WATRING, for appellees:

1.—*Voluntary Conveyance in whole or in part not good as to existing creditors.*—Bump. Fr. Conv. 262, 286; Code, c. 74, s. 2; 10 W. Va. 87.

2.—*Good faith of grantee need not be enquired into if conveyance is voluntary.*—Bump. Fr. Conv. 197; 24 W. Va. 730; 30 W. Va. 641.

3.—*Fraudulent on part of grantors; may be inferred from circumstances.*—Bump. Fr. Conv. 34, 43, 265; 8 Encyclopedia of Law 753; 17 W. Va. 717; 22 W. Va. 583; 32 W. Va. 515; 33 W. Va. 388, 452; 34 W. Va. 95; 35 W. Va. 719, 754.

515; 33 W. Va. 388, 452; 34 W. Va. 95; 35 W. Va. 719; 754.

4.—*Badges of fraud.*—Bump. Fr. Conv. 34, 36, 44, 50, 51, 52, 442; 1 Per. Fr. (4th Ed.) § 202, 203, 204, 205; 22 W. Va., *supra* (especially 594.)

5.—*On questions of fraud generally as applicable to this case.*— —Bump. Fr. Conv. 53, 200, 201, 202; 8 Encyclopedia of Law 756 to 759; 22 W. Va., *supra.*

6.—*Not necessary to refer to a commissioner.*—27 W. Va. 210 (18 S. E. Rep. 376-7).

7.—*Reading evidence in original suit on petitions of Greer & Laing.*—Sand Eq. 688 (2d Ed.); 1 Barton's Chancery Practice 340, § 109; 27 Gratt. 287; 19 W. Va. 367; 30 W. Va. 443; 31 W. Va. 156 (159).

ENGLISH, JUDGE:

This was a suit in equity in which the bill was filed at the

October rules, 1889, in the Circuit Court of Preston county, by J. T. Goodwin, Louis Schrader and Henrietta Richardson, against George M. Ralphsnyder, Virginia Potter, widow and administratrix of William R. Potter, deceased, in her own right and as such administratrix, and J. Ami Martin, defendants. The object of this suit, as appears from the face of the bill (which greatly exceeds in length what is usually embraced in such proceedings) is to set aside as fraudulent a certain deed of conveyance which appears to have been executed by William R. Potter in his lifetime to the defendant George M. Ralphsnyder, which deed bears date the 31st day of January, 1887, and was admitted to record on the same day, and which deed purports to convey to said George M. Ralphsnyder a certain lot in the town of Kingwood, with the buildings and appurtenances thereon, together with the pump in the well, and the hose connected thereto, and also the whole stock of goods in the store room on said lot, and the goods stored in the cellar, and to subject the same to the payment of a debt alleged to be due the plaintiffs from said William R. Potter of three hundred and forty two dollars and twenty three cents.

The material allegations of the bill are as follows: That the said William R. Potter purchased the lot of land, which is sought to be subjected, from the defendant Martin for the consideration of four hundred dollars. That after said purchase said Potter erected a large building thereon, to be used partly as a dwelling house and partly as a storehouse, and did occupy said building as a dwelling and storehouse until January 31, 1887, when he attempted to convey the same to George M. Ralphsnyder; that said Potter, for several years prior to said purchase, had been engaged in the business of retail merchant in said town, and had become largely indebted to various wholesale establishments and other parties in large sums of money, aggregating many hundred dollars: that said creditors became uneasy about their claims, and demanded payment, and threatened suit if the same were not soon paid; that being thus threatened and harassed, and fearing his property would be subjected to sale by his creditors, he determined to put his property out of his hands, for the

purpose of hindering, delaying and defrauding his creditors in and about the collection of their said debts; that, in order to consummate his design, he entered into a compact with the defendant George M. Ralphsnyder, under the advice of I. C. Ralphsnyder, a brother of said George M. Ralphsnyder, who at the time was attorney and counsel of said Potter, whereby he (the said Potter) should convey all of said property to said George M. for the sole purpose of hindering, delaying and defrauding his creditors, and especially the plaintiffs; that, in order to carry out said design and agreement, said Potter, being advised and assisted by the defendant George M. Ralphsnyder, and his brother I. C. Ralphsnyder, the attorney for said Potter, on the 31st day of January, 1887, pretended to convey to said George M. the said house and lot in the town of Kingwood, together with all the articles of merchandise therein contained, consisting of hardware, drugs, etc., for the pretended consideration of four hundred dollars cash in hand paid, and other considerations mentioned in the deed, which is exhibited, and in which the additional consideration appears to have been the assumption on the part of said George M. of the payment of two notes of one hundred dollars each, dated April 1, 1884, and April 1, 1885, which said Martin held against said Potter, which were liens on said real estate; that at the time of said pretended conveyance, and for a long time prior thereto, said Potter was indebted to plaintiffs in a large sum of money, and had been running an account with them since the 12th day of February, 1884, up and until the 21st day of January, 1887, just ten days before said pretended conveyance; that during that time said Potter had bought from plaintiffs merchandise aggregating one thousand one hundred and twenty eight dollars and sixty one cents, and had paid them seven hundred and eighty six dollars and thirty eight cents, leaving a balance due them at the time of said pretended sale of three hundred and forty two dollars and twenty three cents, exclusive of interest; that this was a dealing between merchant and merchant, and that the statute of limitations as between such parties only applied, and that they were entitled to interest on their account after sixty days, on general average; that the

merchandise of various kinds in said storeroom at the time of said pretended sale were, in the aggregate, in value far in excess of the whole price pretended to have been paid for both said merchandise and house and lot. That the merchandise in said house at that time was worth from eight hundred dollars to one thousand dollars, and that said house and lot were at that time, and are now, worth from eight hundred dollars to one thousand two hundred dollars; and that the said sum of six hundred dollars was grossly inadequate to the true value of said property; that it was not a valuable consideration, in law or in fact, and that the same was therefore fraudulent, null, and void as to the debts of creditors of said Potter, and especially as to the debts of plaintiffs; that the said George M. Ralphsnyder did not pay the pretended amount of four hundred dollars, or any other amount, or any consideration, upon the pretended purchase, neither was it intended at the time by either said Potter or said Ralphsnyder that the same should be paid by the said Ralphsnyder; that the recitals in said deed are false, and were made for the sole purpose of hindering, delaying and defrauding the creditors of said Potter, and especially the plaintiffs, about the collection of their debt; that at the time of said conveyance, or very soon thereafter, said George M. Ralphsnyder took charge and control of the notes and book accounts of said Potter, and proceeded to collect the same in his own right, and did collect large sums of money on said notes and book accounts in his own right and name, and has never turned over said money to said Potter, or to any one entitled to receive the same, and that at the time said notes and book accounts were turned over to said Ralphsnyder he did not pay anything to said Potter for them, but that said transfer or assignment of said notes and accounts to said Ralphsnyder was made with the full knowledge of both parties to the transaction, for the sole purpose of hindering, delaying and defrauding the creditors of said Potter, and especially the plaintiffs; that at the time of said pretended conveyance said George M. Ralphsnyder was not assessed with any property or money, and that he in fact did not have any money with which to purchase either real estate or personal prop-

erty, and pay for it; that only a portion of the two notes due
said Martin, and assumed to be paid by said George Ralph-
snyder, has been paid, and that which has been paid was not
paid out of funds belonging to said George M. Ralphsnyder;
that said George M. Ralphsnyder had full and complete
knowledge of the fraudulent intent of said Potter at the
time of said conveyance, and knew fully that said Potter was
doing so for the purpose of hindering, delaying and defraud-
ing his creditors, and especially the plaintiffs; that at the
time of said pretended conveyance there was an understand-
ing and agreement between said Ralphsnyder, defendant, and
said Potter to the effect that at some time subsequent there-
to, either when it might be thought proper by the parties or
at some particular time specified in said contract, the said
George M. Ralphsnyder should reconvey the said property to
said Potter; that subsequent to said conveyance, some time
in 1888, said W. R. Potter departed this life intestate, and his
widow, the defendant, Virginia Potter, qualified as his ad-
ministratrix; that the said Virginia Potter was fully conver-
sant and familiar with the said sale and conveyance, and the
character of the whole transaction, and that she did then
and does now know about the condition of the said sale. and
that she knew all about the contract between her husband and
the said George M. Ralphsnyder, by which he was to reconvey
said property to her said husband. And the plaintiffs call
upon said Virginia Potter to answer what she may know
about said transfer and sale; how much of said four hundred
dollars was in fact paid; who paid the same, and where the
money came from; what she may know about said contract
or agreement between said G. M. Ralphsnyder and her hus-
band, whereby he should at some future time reconvey said
property to her husband; whether said contract was in writ-
ing, and, if so, whether she had a copy thereof; and where
said original contract is, if she has not got it; and, if said con-
tract was not in writing, that she answer as to its character,
effect, and conditions; also whether her co-defendant George
M. Ralphsnyder did not take charge of the notes and accounts
of her said husband, and collect the same; what said notes

and accounts amounted to; how much the said George M. collected thereof, and paid over to her said husband; and if it was not true that said George M. collected accounts and notes due her said husband, and paid the same on part of the consideration mentioned in said deed from W. R. Potter to the said George M. Ralphsnyder. And the plaintiffs propound six interrogatories to said George M. Ralphsnyder, calling on him to disclose how much purchase money was actually paid to said Potter by him, and whether it is not true that at the time of said purchase he was merely a law student and did not have four hundred dollars, or any considerable sum of money with which to purchase property and pay for it; whether, if any money was paid on said purchase, it was not money of his brother I. C. Ralphsnyder, or some one else; whether it is not true that he, or some one for him, took an inventory of the goods directly before or shortly after said purchase, and if he did not tell any person what the value of said stock was, and what it amounted to by said inventory; and he is also called upon to produce a list of said articles of merchandise, and to state their value when he bought the same; also whether he took charge of the books and notes of said W. R. Potter, and proceeded to collect, and did collect, various amounts thereon, and if part of the money so collected was not paid on the debt, and became part of the consideration of six hundred dollars mentioned in said deed; and that he file a list of the notes and accounts which he took into his possession to collect for said Potter, or for any other purpose, what money he collected, and what he did with the same.

The defendant George M. Ralphsnyder occupies nearly twenty pages of the printed record in putting in issue the allegations of the bill, and in responding to the interrogatories propounded to him in said bill.

Virginia Potter, widow of said W. R. Potter, also answered the bill, admitting that she qualified as administratrix of her deceased husband. That she only received of the estate some personal property which she claimed as exempt against creditors, and alleging that she was no party to any of the alleged fraudulent transactions stated in plaintiff's bill. That

for want of information on the subject she can not answer the interrogatories propounded to her in said bill, except that she is aware that the books and accounts of the late Dr. Potter passed into the hands of I. C. Ralphsnyder, attorney at law. That this was all the personal property owned by said William R. Potter, except what was so held as exempt, which latter was less than two hundred dollars; and she claims her dower interest in the real and personal estate of said W. R. Potter.

J. Ami Martin, who is named as defendant, also answered said bill, admitting that on the first day of April, 1881, he sold and conveyed said lot of land to W. R. Potter for the sum of four hundred dollars, in payments of one hundred dollars each, payable in one, two, three and four years. That the first two of said notes had been paid, but the last two, which fell due on April 1, 1884 and 1885, respectively, have not been paid, but are entitled to two credits, one of sixty dollars or sixty five dollars, paid by George M. Ralphsnyder in the early part of 1888, and another of thirty three dollars and thirty nine cents paid the 24th of March, 1887, by I. C. Ralphsnyder, a brother of said George M. Ralphsnyder, assigning to respondent a note executed by one A. S. Pratt to said I. C. Ralphsnyder for said amount. That said notes were assigned by him to W. G. Brown, who held them for some time; and that respondent has taken said notes back, and exhibits them with his answer, and asks that the same, and the lien by which they are secured, may be enforced, and that said lien be paid from the sale of said lot.

Numerous depositions were taken in the cause, and on the 4th day of April, 1891, a *nunc pro tunc* order was entered, reciting that at the December term, 1890, the plaintiffs, upon the pleadings and evidence in the cause taken, suggested that evidence so taken disclosed that I. C. Ralphsnyder had an interest in the property conveyed to his brother, the defendant George M. Ralphsnyder; and thereupon said plaintiffs, by their attorney, moved the court for leave to file an amended bill, making the said I. C. Ralphsnyder a codefendant; which motion was resisted by said I. C. Ralphsnyder in person, and as attorney for his brother, and the motion was overruled,

and the court refused to allow the bill to be so amended, and the plaintiffs excepted. On the same day the cause was again heard upon the bill, exhibits, answers and depositions; and the court being of opinion, from the pleadings and proofs, that the conveyance of the storehouse and lot and stock of goods by William R. Potter to the defendant George M. Ralphsnyder, as set forth in the pleadings and evidence, was made by said W. R. Potter with intent to hinder, delay and defraud his creditors, and especially the plaintiffs, and that the defendant George M. Ralphsnyder had full knowledge of such fraudulent intent on the part of his grantor, it was therefore decreed that the deed set forth in plaintiffs' Exhibit B, filed with their bill, dated January 31, 1887, be decreed fraudulent and void, and set aside and held for nought, as to the plaintiffs' debt established in the pleadings and proofs against the estate of W. R. Potter, deceased; and that there was due to J. Ami Martin from the estate of William R. Potter, deceased, the sum of one hundred and eighty five dollars and fifty one cents, balance of purchase money, with interest from the date of said decree, which debt is secured by vendor's lien on said real estate; and it further appearing that there was due from the estate of William R. Potter, deceased, to the plaintiffs the sum of three hundred and sixty nine dollars and fifty five cents, with interest from the date of said decree, which debt is a lien on said real estate from the filing of the bill, it was ordered and decreed that the defendant Virginia Potter, as administratrix of the estate of William R. Potter, deceased, do pay to the plaintiffs the said sum of three hundred and sixty nine dollars and fifty five cents, with interest from the date of said decree; and as to the prayer of said Virginia Potter, widow, in her answer, for dower in said real and personal estate, the same was reserved, with all questions touching the same, for the future consideration and order of the court; and it was further decreed that unless the said Virginia Potter, as such administratrix, should within thirty days from the date pay to the plaintiffs, out of the estate of William R. Potter, deceased, in her hands to be administered, the sum of three hundred and sixty nine dollars and fifty five cents, with interest from date, together with

the costs of said suit, or unless some other person should pay said debt and costs for her, a special commissioner therein named should on some court day, at the front door of the court house of said county, make sale of said real estate upon the terms therein prescribed; and the sheriff of said county was directed at once to take charge and possession of the storeroom mentioned in said Exhibit B, and ascertain how much of said stock of goods remained in said storeroom, and list and appraise the same; and said special commissioner was also directed, in making the sale of said real estate, to also sell said stock of goods as a whole, allowing the defendant or his attorney to remove any goods, not belonging to the original stock, which were brought and put there by him since said purchase.

On the 21st day of July, 1891, a decree was entered in said cause, confirming the report of the special commissioner appointed to make sale of said storehouse and lot and stock of goods, which appear to have brought one thousand and ten dollars at said sale, three hundred and thirty six dollars and sixty six cents of which amount was paid down, and two single bills for a like amount, payable in one and two years, with interest, were executed to said commissioner for the residue; and said decree also directed the manner of disbursing said cash payment.

J. R. Greer, A. Laing and W. Cruickshank, doing business under the firm name of Greer & Laing, filed their petition in the cause, alleging that said W. R. Potter was largely indebted to them for goods and merchandise which he had purchased from them prior to the 21st day of March, 1884, and on said date said Potter executed his negotiable note to them for three hundred and nineteen dollars and twenty one cents, payable sixty days after date, at the National Bank of Kingwood, which note is exhibited with said petition; that no part of said note had been paid; and also making the same allegations in regard to the conveyance of said storehouse and stock of goods to George M. Ralphsnyder as were made in the bill filed by Richardson, Goodwin & Co., in their bill; reciting the fact that said deed had been set aside as voluntary, fraudulent and void, in said suit of Richardson, Goodwin & Co., and

their debt declared a lien thereon, and said house and lot, and so much of the stock of goods that remained, had been sold to pay plaintiffs' debt; and said petitioners allege that after the payment of said Richardson, Goodwin & Co.'s debt there will remain a considerable surplus fund from the proceeds of said sale, and they ask that they may be allowed to come in and be made parties plaintiff in said cause, and that all the proceedings in said cause may be taken and read as part of their petition; that said deed from W. R. Potter to George M. Ralphsnyder may be declared voluntary, fraudulent and void, and set aside as to petitioners' debt; and that any surplus remaining after the payment of the lien and charges decreed against her may be applied to the debt of petitioners.

George M. Ralphsnyder filed his answer, putting in issue the allegations of said petition, which answer was replied to generally; and on the 29th day of March, 1892, a decree was entered in said cause, ascertaining the amount of said petitioner's claim, holding said deed to George M. Ralphsnyder fraudulent and void as to said petitioner's debt, and directing that unless said debt be sooner paid by Virginia Potter, administratrix, or some one for her, said special commissioner apply any surplus in his hands towards the payment of said petitioners' debt; and from said decree rendered in the case of Richardson, Goodwin & Co. against George M. Ralphsnyder and others, on the 4th day of April, 1891, said George M. Ralphsnyder obtained this appeal assigning as the first error the action of the court in holding the deed from William R. Potter to George M. Ralphsnyder fraudulent and void as to the rights of the plaintiffs.

Now, this Court held in the case of *Lockhart* v. *Beckley*, 10 W. Va. 88 (9th point of syllabus) that "fraud is to be legally inferred from the facts and circumstances of the case, when those facts and circumstances are of such a character as to lead a reasonable man to the conclusion that the conveyance was made with the intent to hinder, delay, or defraud existing or future creditors." See, also, *Bartlett* v. *Cleavenger*, 35 W. Va. 720 (14 S. E. Rep. 273). Now, in considering the circumstances surrounding this transaction, it is proper to look,

first, at the pecuniary condition of William R. Potter at the time he attempted to convey his house and lot and stock of goods to George M. Ralphsnyder; and the evidence discloses that at the time he was indebted to two firms in the city of Wheeling in a sum greatly in excess of the consideration named in the deed which ostensibly transferred his house, store and stock of goods. Two days previously he had trans ferred to his attorney and legal advisor all of his accounts and notes, in consideration of past and future legal services, and to his mother and sister all of his interest in the home farm, which constituted his entire property, with the exception of his household goods. About the 1st of August he settled with the witness C. C. Craig, and fell in his debt sixty or seventy dollars. He told said witness that he had no money; that he had large accounts standing out, as much as five hundred dollars or six hundred dollars, and from one thousand dollars to one thousand two hundred dollars in goods; insisted on his buying goods saying that he had better take goods when he could get them; that he might not be in business very long. This conversation occurred a few days before said Potter sold out. What the real consideration of the transfer of the books, notes and accounts to I. C. Ralph-snyder was, does not appear. It lies concealed under the general description of "past and future legal services." This assignment or transfer of books and accounts appears by the testimony of I. C. Ralphsnyder to have been made on the 29th day of January, 1887, and on the 31st day of January, 1887, the deeds from said W. R. Potter to George M. Ralphsnyder for the storehouse and merchandise, and to his mother and sister for his interest in the home farm; and the inquiry suggests itself, at this point, why did W. R. Potter at this time suddenly conclude to part with all of his property, selling his home, his storehouse and store goods for less than half what it subsequently brought at public sale, and for less than one third of what the testimony shows it was really worth? He sells it to a young man, the brother of his attorney and legal adviser, who is accidentally in the town of Kingwood on a visit to his brother, but who is a resident of another county, where he lived on a farm with his father, who is assessed

with no property at his home, but who is stated to have been interested in a wheat crop, and had a horse and some cattle; who borrowed three hundred and ninety dollars of the four hundred dollars cash payment from his brother I. C. Ralphsnyder, who had the books, notes and accounts of W. R. Potter in his possession; who had no money to invest in speculation, but learned of this speculation from the confidential legal adviser of said Potter, as it can not be presumed that a mere visitor in the town would so soon learn that said Potter wanted to sell; and it is reasonable to suppose that his brother I. C., in their confidential talks, would not only advise him of the fact; but at the same time assist his client in finding a purchaser, although he had to furnish the money to that purchaser to enable him to make the purchase; and another fact shown by the deposition of said George M. Ralphsnyder is significant, and that is that said George M. took no inventory of said goods, either directly before or shortly after the purchase; he just took them upon the representation of said Potter, making what is called, in common parlance, a "lumping trade." This transaction was not accompanied with the usual deliberation practiced by men in such transactions. Again, George A. Walls, in detailing the circumstances of this transaction, says that four hundred dollars was paid to Dr. W. R. Potter in the store room of said Potter, and his recollection is that it was paid by the hands of I. C. Ralphsnyder. He did not count the money, but saw it passed to the hands of said Potter and understood that it was four hundred dollars. This was after dark, near eight o'clock in the evening. Said Walls also states that, after taking the acknowledgment of said deed, Mr. I. C. Ralphsnyder said that he would like to have the acknowledgment written out and the deed recorded. "We then came down to the office—I think all three of us came; I wouldn't be positive about that—and, after coming to the office, I said to Mr. Ralphsnyder that I would make a memorandum of the acknowledgment to said deed, and mark it, 'Filed for record;' but he said, 'No;' he would rather have the acknowledgment written out in full, and the deed recorded. I then told him, 'All right;' that I would write the acknowledgment of the

deed, and sign it, but that it was too late to record it that night." He also says the certificate was written out that night at the urgent request of Mr. I. C. Ralphsnyder, who said he wanted the matter entirely closed up, and that a mere memorandum would not be legal, he was afraid. Whether Mr. I. C. Ralphsnyder was acting in the interest of his client W. R. Potter, or his brother George M., when he was in the clerk's office, between eight and nine o'clock at night, urging the immediate recordation of said deed, does not appear; nor is it very material. He was there, and appears to have been apprehensive. The clerk testifies that such haste is unusual in indorsing the certificate of acknowledgment upon deeds, or in recording the same. What, then, was the cause of this haste? Could it have have been that I. C. Ralphsnyder, who was the legal adviser of said Potter, and so well acquainted with his pecuniary condition and liabilities, was apprehensive of some attack from the creditors of said Potter, and wished to hinder, delay and defraud them by transferring all of his property beyond their reach? These however, are not all the circumstances which point in that direction. The witness H. H. Potter testifies as follows: "I could not say how long it was before the sale, but it was before the house was finished that he sold, and before he burned out, down on Price street. I happened in his store, and he and Mr. Frey, of Greer & Laing, were talking about some old bills, and Mr. Frey said he would see that they were straightened up, and took the number of some checks." After Mr. Frey went away, doc (meaning W. R. Potter) told him that they had not given him credit for payments he had made, and had him charged on the books with several hundred dollars more than he owed them, and that he intended straightening them out on them. After Mr. Frey was gone a day or two, said Potter called him over to his store, and showed him a receipt or two, and a statement from Greer & Laing on which there were no credits to correspond with the receipt. After Potter burnt out and moved into the new building, he (witness) went up there to see Mr. Frey, and he and the doctor were running over this account again, and, after Frey was gone, Dr. Potter told him that he never in-

tended to pay what Greer & Laing claimed off of him; that he did not owe them one half what they claimed; and that he would spend all he had before he would pay a debt twice. After the sale, said H. H. Potter also testifies to a conversation had with I. C. Ralphsnyder at the storehouse, in the presence of Dr. Potter, in which he told I. C. Ralphsnyder that if he had swindled Dr. Potter out of his building he could not beat witness out of what little he had. He replied that he had not done anything of the kind; that he had paid all that it was worth. He (witness) told him he did not think so, and he said there was nobody else that would give any more for it, and witness told him that he knew better. Dr. Potter was present and he said: "Why did not they do it, if they would?" Witness remarked that he did not think they had a proper chance, and he said he reckoned that they could have a chance yet if they wanted to pay more; and Mr. I. C. Ralphsnyder then said, if there was anybody that wanted to pay more, they could have the chance then to do it. Witness told him he would give him fifty dollars for his bargain right there, and he said witness could have it. Witness named the amount he understood he had paid. He said it was fifty dollars more than that. Witness told him he would go to the record, and see what it said; and he (Ralphsnyder) replied that there was a little difference between him and Dr. Potter before, that was not considered in the record, amounting to fifty dollars, or about that. Dr. Potter then said that was correct. Witness then said he would advance him fifty dollars on that yet. He said it was a trade, and witness so considered it. He said he wanted the cash right down. Witness told him he would pay him twenty five dollars and the rest as soon as the papers were made over, cash in hand. He said it was not necessary to take the twenty five dollars; that he would make the papers out at one o'clock. Witness told him he would meet him at the clerk's office. Witness got the money, and went to the clerk's office, and waited until two o'clock, but Ralphsnyder did not come. Witness also states that Dr. Potter told him that he had said I. C. Ralphsnyder employed as his attorney by the year.

Another circumstance is shown by the answer of J. Ami.

Martin, who is the holder of the two notes for the one hundred dollars each, secured by vendor's lien on said lot. He says sixty dollars or sixty five dollars was paid by George M. Ralphsnyder in the early part of March, 1888, and a payment of thirty three dollars and thirty nine cents was made about the 24th of March, 1887, by said I. C. Ralphsnyder assigning to him a note on A. S. Pratt, executed to said I. C. Ralphsnyder for that amount. This is but another circumstance showing how and by whom said purchase money was paid.

Now, as to the fact developed in the testimony of H. H. Potter, of a false recital as to the considerations named in the deed from W. R. Potter to George M. Ralphsnyder, creating a discrepancy of fifty dollars; Bump on Fraudulent Conveyances (at page 40) says: "An instrument which misrepresents the transaction that it recites is evidence of a secret trust, and is calculated to mislead and deceive creditors. A false recital is therefore a badge of fraud, and the instrument in which it occurs must sustain a rigorous examination."

Another fact which strongly indicates a secret trust is disclosed in the testimony of I. C. Ralphsnyder, who states that after said transfer he paid over to W. R. Potter and wife one hundred dollars or one hundred and fifty dollars collected by him on store accounts placed in his hands by said Potter. Now, it appears by the testimony of I. C. Ralphsnyder that on the 20th day of January, 1887, all the books and accounts of said W. R. Potter had been transferred and assigned to said I. C. Ralphsnyder in consideration of past and future professional services, yet said I. C. Ralphsnyder testifies that said Potter told him he needed money, and assigned that as a reason for wanting him to collect these claims, one hundred dollars or a hundred and fifty dollars of which he states he paid over to him; and he says, further, that said Potter told him he intended to pay all of his debts; but how he was to pay any debt out of the accounts, etc., assigned to said I. C. Ralphsnyder for legal services, unless said Ralphsnyder secretly paid the money collected to him, no one can tell. That such was not his intention, however, is plainly apparent from the fact that he sold and conveyed his home, his storehouse and store goods to George M. Ralphsnyder for less than one

third of its value; that I. C. Ralphsnyder, his confidential legal adviser, not only found a purchaser of this property in the person of his impecunious brother, who was paying him a visit, but furnished him with nearly all of the money with which to make the purchase; and that the deed for same was hurried on to the record at nine o'clock at night, the clerk testifying that he wrote out the certificate of acknowledgment at the urgent request of I. C. Ralphsnyder, who said he wanted the matter entirely closed up, and that a memorandum would not be legal, he was afraid.   The question naturally suggests itself, afraid of what? and why could not the deed as well have been recorded the next day? or the acknowledgment endorsed the next day?   Another fact which tends to elucidate this conduct, and account for this haste, appears in the testimony of H. H. Potter, who says that said W. R. Potter told him before this sale that he never intended to pay what Greer & Laing claimed off of him; that he did not owe them one half they claimed, and that he would spend all he had before he would pay a debt twice; and, at the same time that he conveyed his home and storehouse and store goods, he conveyed his interest in his father's place (the home farm).   Everything he had in the shape of property was apparently transferred to *bona fide* purchasers, yet I. C. Ralphsnyder, several days after the sale, in the presence of Dr. Potter, told H. H. Potter that he could have the property by paying one hundred dollars advance on the cost price, without consulting his brother George M. Ralphsnyder; and this fact, combined with the confidential relations existing between said I. C. Ralphsnyder and W. R. Potter, and his brother George M. Ralphsnyder, are very potent in convincing the unprejudiced mind that George M. Ralphsnyder was not only fully aware of the fraudulent intent of said W. R. Potter in attempting to transfer his property beyond the reach of his creditors, but that he allowed himself to be used by his brother I. C. Ralphsnyder as an instrument by which that object was sought to be effected.   I. C. Ralphsnyder was a very active and efficient agent for his client.   He not only found him a purchaser, but furnished the purchaser with the money to pay the cash payment and a part of the defer-

red payment. It is stated in evidence that W. R. Potter needed money to pay debts with, but, as to any debt ever having been paid by W. R. Potter to any one of his creditors with the four hundred dollars received as the proceeds of his house and lot and store, the record is silent. No inventory of the goods was taken at the time of the purchase, but George M. Ralphsnyder testifies that he had long since repaid to his brother I. C. Ralphsnyder the money he borrowed from him to make the purchase; and this statement is made on the 29th day of August, 1890; this suit was brought in October, 1889; and the conveyance was made in January, 1887 —so that if this statement of said George M. be true, that he had long since paid his brother, if he paid out of the business, he must have been much more successful than said W. R. Potter was during the time he was conducting the business, and the evidence fails to show that said George M. Ralphsnyder had any other source from which to derive the money to pay back said money.

Now; in the case of *Reilly* v. *Barr*, 34 W. Va. 96 (11 S. E. Rep. 750) this Court held that "when it appears that an instrument conveying real estate is impeached as fraudulent by creditors of the grantor, if the evidence discloses the fact that said instrument is false in any material part, the burden of showing the transaction was fair lies upon the party who seeks to uphold it." Now the consideration named in this deed was four hundred dollars, and yet H. H. Potter swears that I. C. Ralphsnyder told him, in the presence of W. R. Potter, when he was talking of buying the property, that the true consideration was four hundred and fifty dollars; and that there was a difference between Dr. Potter and him that was not considered in the record; so that, if this be true, there was another fifty dollars of purchase money not paid by George M. but by I. C. Ralphsnyder, and the deed is shown to be false in a very material part, and the burden of showing the transaction was fair is thrown upon said George M. Ralphsnyder.

Waite, in his work on Fraudulent Conveyances, says, quoting from Story, Judge: " 'Fraud is always a question of fact with reference to the intention of the grantor. Where

there is no fraud, there is no infirmity in the deed. Every case depends upon its circumstances, and is to be carefully scrutinized; but the vital question is always the good faith of the transaction. There is no other test. Fraud does not consist in mere intention, but in intention carried out by hurtful acts. Fraud or no fraud is generally a question of fact, to be determined by all the circumstances of the case.' Direct proof of positive fraud, in the various kinds of covinous alienations which we are to discuss, is not, as we shall presently see, generally attainable, nor is it vitally essential. The fraudulent conspirators will not be prompted to proclaim their unlawful intentions from the housetops, or to summon disinterested witnesses to their nefarious schemes. The transaction, like a crime, is generally consummated under cover of darkness, with the safeguard of secrecy thrown about it. Hence it must be judged of by all the surrounding circumstances of the case. The evidence is almost always circumstantial. Nevertheless, though circumstantial, it produces conviction in the mind often of more force than direct testimony." Among the badges of fraud enumerated by Waite in his work on Fraudulent Conveyances are the failure to take an account of stock, and a false admission of the receipt of purchase money, both of which are present in this instance.

The question as to whether George M. Ralphsnyder had notice of any fraudulent intent on the part of his grantor, W. R. Potter, is one which also may be determined by the surrounding circumstances. The testimony shows that for a week previous to the purchase of this property from W. R. Potter, he had been a visitor of his brother, and had been with him night and day. Two days before the deed was made, said Potter had transferred his books and accounts to I. C. Ralphsnyder, and it surely never would have occurred to George M. to purchase this property if I. C. Ralphsnyder had not told him of its value, and offered to loan him the money; and Mr. Wall says, in his testimony, that George M. was in the clerk's office when his brother I. C. was urging the immediate recordation of the deed; and the evidence clearly showing that said

W. R. Potter made this conveyance with fraudulent intent, and I. C. Ralphsnyder acting as legal adviser of said Potter and George M. (his brother) at the same time, the conclusion is irresistable that he explained the entire matter to said George M. before the purchase was made; and, although the parties went through the formality of paying over the four hundred dollars in the presence of a witness, yet the said Potter, having conceived the fraudulent intent of defrauding his creditors, could easily have handed the money back to I. C. Ralphsnyder, who Wall says handed him (Potter) the money, as the transaction between them in regard to the fifty dollars which was not included in the consideration named in the deed, clearly shows that their relations were very intimate and confidential. Taking the whole circumstances surrounding the transaction, then, my conclusion is that said George M. Ralphsnyder had full notice of the fraudulent intent of said W. R. Potter.

In the case of *Smith* v. *Yoke,* 27 W. Va. 639, this Court held that where a decree sought to be reversed is based upon depositions which are so conflicting, and of such doubtful and unsatisfactory character, that different minds and different judges might reasonably disagree as to the facts proved by them, or the proper conclusions to be deduced therefrom, the appellate court will decline to reverse the finding or decree of the chancellor, although the testimony may be such that the appellate court might have pronounced a different decree if it had acted upon the cause in the first instance. The same thing is held in the case of *Bartlett* v. *Cleavenger,* 35 W. Va. 720 (14 S. E. Rep. 273).

Applying the law, then, to the facts and circumstances shown in this case, my conclusion is that the court committed no error in decreeing that the deed from W. R. Potter to George M. Ralphsnyder was fraudulent and void as to the rights of the plaintiffs.

The next error assigned is in not ascertaining the personal estate of William R. Porter, and settling the administration accounts of his personal representative, before any sale of the land and goods in the cause described.

As to this assignment of error it appears by the answer

of Virginia Potter, widow, and administratrix of the estate of W. R. Potter, deceased, that the books and accounts which were assigned by W. R. Potter to I. C. Ralphsnyder were all the personal property owned by said W. R. Potter, except what was held as exempt, which was less than two hundred dollars; and she elects to take her dower in gross out of the property sold; and for that reason there was no necessity of assigning her dower, and there was no necessity of directing an account [see *Sweeney* v. *Refining Co.*, 30 W. Va. 443 (4 S. E. Rep. 431)] this being a suit to set aside a fraudulent conveyance, and the only personalty being the stock of goods claimed by the defendant George M. Ralphsnyder. See *Clark* v. *Figgins*, 31 W. Va. 156 (5 S. E. Rep. 643) where it is held that where an assignment of personal property is made in fraud of creditors, they or any of them may, in a court of equity, have the same set aside.

The creditor who first files his bill obtains thereby a priority, and is entitled to be first paid from the proceeds of the sale of the property, if there are no valid prior liens.

The deed, though ever so fraudulent as to existing creditors of the grantor, is valid and binding as between the parties to the fraud. See *Core* v. *Cunningham*, 27 W. Va. 210.

It is further assigned as error that the court decreed a sale of the property without giving the appellant George M. Ralphsnyder a day in which to relieve the same from sale. The plaintiffs, however, asserted no claim, and were entitled to no decree, for money against said George M. Ralphsnyder, and obtained no such decree against him. Their decree was against the estate of W. R. Potter, and his personal representative was allowed thirty days in which to pay said decree.

It is also assigned that it was error to read the evidence and pleading in the original cause in the petition proceeding of Greer & Laing against appellant. We find it stated, however, in Sands' Suit in Equity (page 688) that "creditors may come in by petition to a suit attacking a deed on the ground of fraud, and their priority will be determined by the date of filing their petition, unless they have other ground of priority," citing *Wallace's Adm'r* v. *Treakle*, 27 Gratt. 479.

See, also, 1 Bart.' Ch. Prac. p. 340. A creditor may, under the practice, file his petition in a cause pending which has for its object the vacation of a fraudulent conveyance, and upon proper allegations be made a party to the suit; and the bill, exhibits, answers, depositions, orders and decrees, and all the proceedings in said cause, may, upon proper prayer, be read as part of his petition. See 3 Daniell, Ch. Pl. & Pr. p. 2142; 1 Daniell, Ch. Pl. & Pr. p. 874.

It is also claimed that it was error to overrule the demurrer of appellant to the petition of Greer & Laing, but as no reason for the demurrer is assigned in argument, and we see no objection to said petition, we must conclude that said demurrer was properly overruled.

This disposes of the errors assigned, and, for the reasons above stated, my conclusion is that there is no error in the decree complained of, and the same is affirmed, with costs and damages.