# CHARLESTON.

SMITH *et al.* v. JOHNSON *et al.*

Submitted May 9, 1916. Decided May 16, 1916.

1. FRAUDULENT CONVEYANCES — *Subsequent Creditors — Intent of Grantor.*

    A voluntary conveyance of land will be held fraudulent as to subsequent creditors where it was intended by .the grantor so to operate as to future liabilities incurred by him. (p. 397). '

2. SAME—*Fraud of Creditors—Annulment of Deed.*

    Where a debtor who is virtually if not wholly insolvent, and is sued and threatened to be sued, conveys all his real estate, consisting of various tracts, to ·his brother, who at the time apparently is aware of the grantor's financial situation and who has not assumed any proprietary control over the land, but has permitted the grantor thereafter to continue to use and occupy it and enjoy the usufruct thereof, apparently without requiring him to .account therefor, and soon thereafter moved to and since has resided in another county, and the recital in the deed of a cash considera-

tion is disproved and it is doubtful if any consideration was paid or intended to be paid for the land, and the grantor has offered to sell and advertised it for sale in his own name, and by declarations evinced a purpose and intention to thwart the enforcement of his liabilities, a decree annulling the deed as fraudulent at the suit of a creditor will be affirmed, because not plainly erroneous. (p. 398).

Appeal from Circuit Court, Tucker County.

Three suits, one by Charles D. Smith, one by John F. Repair and others, and one by J. F. Robinson and Simpson Ford, trading, etc., all against James Johnson and others. From decrees for plaintiffs, defendants appeal.

*Affirmed.*

*A. Jay Valentine* and *J. Blackburn Ware,* for appellants.

*Wm. G. Conley, J. P. Scott, D. E. Cuppett* and *Chas. D. Smith,* for appellees.

LYNCH, JUDGE:

At April rules, 1914, Charles D. Smith filed his bill against James Johnson and others in the circuit court of Tucker county, and at the ensuing June term an amended bill against the same parties. He alleged, That in October, 1912, James Johnson became indebted to him in the sum of $150, evidenced by the promissory note of the debtor upon which the bank to which he endorsed it later procured a judgment, which complainant paid, wherefore he asks to be subrogated to the status and rights of the bank. That, although James Johnson informed plaintiff when assuming the liability that he was the owner of several tracts of land in Tucker county, yet, as appeared of record, James Johnson, being heavily indebted and having suits by creditors pending against him and anticipating still other litigation of similar character, had on March 20, 1911, conveyed to his brother Raymond three tracts of land in that county, containing 117, 103 and 11 acres respectively, for a pretended and fictitious consideration of $2500 cash, to his brother Orlando an undivided half interest in 26 acres for a pretended consideration of $60 cash, and on April 11, 1913, to Raymond Johnson another tract of 3.8 acres for-

the pretended consideration of $800 cash, with the intent on the part of the grantor in each instance to defraud his creditors and especially the plaintiff, of which intent Raymond and Orlando Johnson had notice; which tract of 117 acres, on December 13, 1911, Raymond Johnson conveyed to his brother Orlando for a consideration entirely fictitious and false, in furtherance of the fraudulent design and purpose of the original grantor. Hence, that James Johnson is still the actual owner of the several tracts so conveyed, and that the grantees hold them in trust for his use and benefit. Plaintiff prayed that the several alleged fraudulent conveyances be set aside and the property thereby conveyed be sold and the proceeds applied to payment of his debt.

Their demurrers to the amended bill having been overruled, the defendants Raymond and Orlando Johnson answered fully. Admitting the conveyances to them as alleged, they denied any fraudulent intent on the part of their grantor and their knowledge thereof, denied knowledge of any indebtedness owed by him or of any litigation pending against him when the grants were made, and averred *bona fides* on the part of all parties and full payment of the consideration recited in the several deeds.

By petition filed at October rules, 1915, Repair Brothers, partners, alleging an indebtedness to them by James Johnson of $50.12 by promissory note dated January 16, 1911, and Robinson & Ford, also partners, alleging an indebtedness by James Johnson to them of $235.54 on open account beginning in November, 1909, adopted the allegations of the original and amended bills, and prayed that they might be made parties to the suit and the conveyances by their debtor annulled and the property thereby conveyed sold in payment of their debts. The objections and demurrers to these petitions were overruled; and the defendants answered them with the same particularity and to the same effect as in case of the amended bill.

The sole defects pointed out in argument on demurrer are that the liability to the plaintiff on the note on which the bank recovered the judgment paid by him arose after the date of the conveyances of March 20th, and that the fraud alleged is

not sufficiently averred. Neither proposition is sound. The first is not, because creditors whose rights accrue after a debtor has disposed of his property may have the transfer annulled, except as between the parties thereto, when fraudulent and voluntary and intended to defeat the payment of debts thereafter contracted by the grantor. *Duncan* v. *Custard,* 24 W. Va. 730; *Mayhew* v. *Clark,* 33 W. Va. 387. The second proposition is not sound, because the bills do sufficiently charge that the deeds were fraudulent and without consideration and were made with intent to defraud, and that the grantees had notice of such purpose and intent. Moreover, the ground urged in support of the denial of the right of Repair Brothers and Robinson & Ford to be heard upon their respective petitions filed in the cause is not tenable. *Richardson* v. *Ralphsnyder,* 40 W. Va. 15.

Upon final hearing, on pleading and proof, the debts of Smith, Repair Brothers and Robinson & Ford were adjudicated in the respective amounts averred, and the conveyances by James to Raymond Johnson of March 20, 1911, for the 103 and 11 acres, and of April 11, 1913, for 3.8 acres were cancelled as fraudulent as to such debts and the land therein conveyed decreed to be sold in payment of plaintiffs' claims; but as to the deed of March 20, 1911, by James to Raymond Johnson for the 26 acres, and of Raymond to Orlando Johnson of December 13, 1911, for the 117 acres, the court, for want of "fraudulent knowledge on the part of the" second grantee denied the relief sought and dismissed the bill and petitions. Raymond Johnson alone appeals.

The decree complained of is sustained, if at all, by numerous but disconnected facts and circumstances, appearing in the record, tending in part to generate a strong suspicion and in part to establish the fact of the fraud alleged. There is little direct or positive evidence either of fraudulent intent on the part of the grantor, or, if such design in fact existed, of knowledge thereof on the part of his grantees.

Each of the deeds assailed recited a cash consideration in the several amounts averred in the bills. The recitals were not suported by the testimony of defendants, but in part if not wholly disproved. They say that the stated consideration

of $2500 in the deed of March 20th to Raymond Johnson
was paid by a note by James Johnson for a pre-existing debt
of $1500 and the balance of $1000 in cash upon delivery of
the deed. But neither of the parties satisfactorily explained
the source from which or the manner in which the cash pay-
ment was procured, or the items of indebtedness that entered
into the note, dated February 1, 1909. An attempt was made
to show that this note was given in payment of two prior ones
aggregating $700 covering miscellaneous transactions between
the brothers, an account of $137, and an additional sum of
$663 covering the share of James Johnson, paid by his brother
Raymond, of losses sustained by them as partners in a livery
business. But it is conclusively shown that the livery business
referred to did not begin until the summer or fall of 1909,
several months after the date of the $1500 note. Nor were
the items making up the two notes for $700 explained, except
by vague and general statements not sustained by any writ-
ten or other evidence of particular transactions. Indeed, Ray-
mond Johnson, when pressed on cross-examination for a defi-
nite statement of the dealings out of which these obligations
were said to arise, became confused and expressed his inabil-
ity to give the information asked for. As to the component
items of the $700, he said they were ''different amounts;
some would be fifty, some seventy-five, some one hundred and
fifty; different amounts along there'' during several years;
''sometimes selling a horse or trading horses, something like
that; different things''. When asked to give a fuller state-
ment of the transactions, he replied: ''I can't, and there aint
no use to try to; I don't remember the items''. Nor did his
brother give the desired explanation. Neither of them seemed
to be able, or if able willing, to specify or explain any one of
these numerous transactions. Likewise, there is a discrepancy
between the consideration clause of the deed of April 11th
and the testimony. The deed recites a cash consideration of
$800. Both grantor and grantee say the consideration con-
sisted of a pair of horses valued at $450 and a check by Ray-
mond Johnson payable to his brother James for $350. But
the deed bears date April 11 and the check December 15,
1913. It was endorsed by James Johnson to the Tucker Coun-

ty Bank, whose cashier testified that it was used to pay a joint note for that amount of James and Raymond Johnson and others payable to the bank. Furthermore, Raymond Johnson failed, in response to a definite inquiry, to state when or how he acquired the horses referred to. These and other circumstances proved would tend strongly to support the claim that the conveyances to Raymond Johnson were in fact without consideration.

By the conveyances of March 20, 1911, it is reasonable to infer from the record, James Johnson transferred all the real estate then owned by him in Tucker county. For 1912 and subsequent years he was assessed with no real estate therein. Moreover, while for several years prior thereto he was assessed with personal property varying in amount from $420 to $1190, in 1911 and 1912 the assessment was reduced to $130, and for 1913 no assessment of personal property appears. The tract of 3.8 acres conveyed to Raymond Johnson April 11, 1913, was acquired by the grantor March 27, 1912, and it did not appear in any assessment against him.

At the time of such transfers of all his real and personal property, if the note of $1500 payable to his brother be included, James Johnson was indebted to banks and private individuals in an aggregate amount of nearly $3000 in the form of promissory notes and open accounts, or in a sum in excess of the value apparently placed by him upon his property at that time. Comparing such liabilities and valuation, he then was insolvent. As disclosed by the records of the circuit court of Tucker county, there were pending therein against him on March 20, 1911, two suits brought by his creditors; and on March 23, 1911, a third and similar suit was instituted by W. A. Groves against James and Raymond Johnson, for the collection of an account against the former for $204, in which the validity of the conveyances of March 20th was attacked; but Raymond Johnson adjusted the claim by a voluntary payment. At that time, Groves testifies, the transfers of March 20th were being generally discussed and unfavorably criticised in the community. The same conveyances were again assailed in August, 1911, by the chancery suit of Biss Skidmore, another creditor of James Johnson; but that proceeding was

settled by his payment of the debt.   The plaintiff therein testifies that pending the suit Raymond Johnson came to him and offered to pay one half of the note evidencing the claim.

Acts and conduct of James Johnson are proved and relied on by plaintiff to show his continued possession and use of the several tracts as owner after the conveyances of March 20, 1911.   From that date until the spring of 1914, James Johnson did retain possession of the land conveyed to his brother Raymond, and resided in the house located on the 11 acre tract, with the exception of a period of six months extending from April to November, 1913, during which the house was occupied by M. C. Dunlap and his family as tenants, with the understanding at the beginning of the tenancy that they were to surrender the property to him at the end of that time.   All the transactions in the renting of the property were conducted by James Johnson.   The rent was paid to him, and so far as appears he did not account to his brother therefor.   Dunlap treated him as the owner, and says he would not have rented the property had he known Raymond Johnson asserted claim to it, although his wife says she understood Raymond owned the land and that James was acting as his agent in managing it.   This latter fact is also asserted by the two brothers.   Yet it seems clear that James, until the institution of this suit, used the property, and occupied it except for the period stated, in all respects as his own; and there is no evidence that he has ever accounted to his brother for such use and occupation.   In March, 1913, he had the boundary line between the 11 acre tract and the adjoining land of John Plum surveyed, in order to settle a dispute as to its location.   He employed and paid the surveyor.   According to the testimony of Plum, James Johnson in 1912 posted on the property notices, signed by himself, forbidding trespass thereon.   From other testimony, not denied, it appears that in the same year he refused Plum permission to do hauling to his farm over a private roadway theretofore used by him through a portion of the Johnson land.   Plaintiff testifies that James Johnson offered to sell to him the 3.8 acre tract in payment of his debt, after the execution of the deed to his brother Raymond therefor, and sought plaintiff's aid in selling the 117

and 103 acre tracts and in the preparation and publication of an advertisement for the sale thereof; that he declined to assist in making the sale, but later saw in a Tucker county newspaper defendant's advertisement of the property for sale as his own. In the spring of 1913, James Johnson also offered to sell one of the tracts to Robinson and Ford, their debt to be deducted from the price. One of them examined the property with him with a view of purchasing it. He admits the sale advertisement referred to by Smith, but claims he was acting on behalf of his brother; but nowhere does he pretend that he had any agency or authority to sell. At no time did Raymond occupy or use the lands covered by the grants to him. He then was a young man twenty-four years of age; and soon after March 20, 1911, he left Tucker county and since has resided and conducted a livery business at Philippi in Barbour county. What particular use he had for or intended to make of the land does not appear; and after the conveyance thereof to him he exercised no apparent proprietary control over it. As further evidence of the continued exercise of ownership by James Johnson, L. W. Parsons testifies that the 3.8 acre tract is a long and narrow strip adjoining the 11 acres, not suitable for use as a separate parcel, and that when he conveyed it to defendant the latter stated it would make him a little more land "or something of that sort."

 In addition to the foregoing circumstances indicative of actual fraud, plaintiff Robinson testified that after the deeds of March 20, 1911, James Johnson assured him and his partner their debt would be paid, and stated, as to the transfer of his property, that "he had done it to keep some people from robbing him and taking what he had, and also told us to say nothing about it"; plaintiff Smith, that "he told me he had conveyed the land to his brother Raymond, and I asked him why he done this, and he stated that Raymond was better able to fight them than he"; and D. E. Cuppett, that in his presence James Johnson consulted Smith at one time and "told him he either had or intended to make a conveyance of his property to his brother, and inquired if in his judgment such a conveyance would stand in law, and Mr. Smith advised him it

would be good between the parties to it and would stand until assailed by some one else''; that later James Johnson came to Smith's office and stated that J. P. Scott had sued him about the land, and inquired if it was "not up to" them to prove the fraud if there was any.

These facts and circumstances, and others appearing in the record, fairly well established and not clearly controverted, seem to be amply sufficient to warrant the decree of cancellation. Because of the character of the transactions and the relationship of defendants, the onus of proof rested on them to show with reasonable clearness the *bona fides* of the conveyances. James Johnson was in financial straits, due in part to his habitual use of intoxicants and in part to business incapacity. Of his situation and condition Raymond doubtless was aware. The proof, when carefully considered, is sufficient to support the inference that he knowingly participated in the fraudulent design of his brother. They were associated together as partners in the conduct and management of a livery stable, and as traders part of the time unfriendly, each insisting the other owed him and demanding a settlement. Their associations were intimate. Each of them, it seems, knew the financial condition of the other; and their conduct as regards these transactions was such as tended to show with approximate certainty that the conveyances were intended by both of them to defeat the enforcement of the liability of James.

As regards Orlando Johnson, the same certainty or knowledge does not appear. Plaintiffs, by cross-assignment of error, complain because the conveyances to him were not set aside. But if he knew the intent and purpose with which the grants to him and Raymond were made, neither that knowledge nor any combination of circumstances from which it may be inferred is established by proof. We think it is not shown that the conveyances to him were intended to hinder or delay the enforcement of the debts of creditors, or were without consideration.

The decree will be affirmed.

*Affirmed.*