## Case No. 1,218.

### BEDILIAN et al. v. SEATON.

[3 Wall. Jr. 279;[1] 17 Leg. Int. 356.]

Circuit Court, D. Pennsylvania. May Term, 1860.

STATUTE OF FRAUDS — TRUSTS CLEAVING TO THE LAND AS DISTINGUISHED FROM PERSONAL CONTRACTS — STALENESS OF DEMAND — PROMISE OF HEIR PREVENTING THE MAKING OF A WILL.

1. A mere promise, though a solemn promise, by heirs at law—two brothers—to convey property as these heirs had declared to their dying brother that they would convey it—will not be looked on favorably as taking a case out of the statute against frauds, even though the promise was actually coupled with comforting assurances to the dying brother as to his health, and remonstrances by which this wish to make a will may have been controlled or even prevented; there being no proof of fraud in the case.

2. Even if the promise had been fraudulent, it would not present the case of a trust which adheres to land, in the possession of persons having notice; but only that of a contract of which chancery would compel the execution. Hence a bill to obtain the benefits of it would have to join the executors or administrators of the two brothers who made it, and could not be enforced against their heirs alone, though in possession of the land with notice.

3. Ten years from the time an involuntary disability of infancy is removed, "stales" a case not originally the best; and this is not altered by the fact that the cumulative disability of coverture was incurred after the involuntary one of infancy had ended: voluntary disabilities, even when not cumulative, not being received in equity as a defence to the charge of staleness.

[In equity. Bill by Bedilian and wife against Seaton for a discovery, account, etc. Heard on demurrer to the bill. Decree for defendants.]

The wife of complainant was a natural daughter of Thomas Seaton, who died in July, 1831, intestate. A few days before his death, Seaton requested two friends of his, Messrs. Barclay and Jack, to come to his house (some twenty-eight miles distance) in order to draw his will for him; he intending to devise all his property to this daughter, who then resided with her mother in his house. Before they came, Seaton was taken suddenly much worse, and died within two or three days. During this time he appeared very anxious about the arrival of his friends, Barclay and Jack. His brothers, James and John, told him "to make his mind easy, that his illness was not so dangerous, that he was not likely to die before they arrived." On the day preceding his decease, he called his brothers to his bedside, and stated his desire that his daughter should have his estate. The brothers, in presence of numerous witnesses said to him: "Brother Tom, make your mind easy—give yourself no trouble about that, Harriet shall have it all—every cent of it." No will was executed, the friends not having arrived till after his death on the next day. When the funeral was over,

---

[1] [Reported by John William Wallace, Esq., and here reprinted by permission.]

the brothers, John and James, after conference with Mr. Barclay, who afterwards became the guardian of the daughter, and others, made a short conveyance of one-third part of all the real and personal property of deceased, which had come to them as heirs at law and next of kin, reciting as consideration for the deed that "it had been the intention of Thomas to leave his estate, or a part thereof, to Harriet, his natural daughter." The promise to give the property to the daughter, "every cent of it," was proved by two female witnesses, of somewhat advanced years, and who gave an account not exactly the same; but whose characters for veracity stood unimpeached. The daughter was born in May, 1823, and in her minority married one Barry. He dying in 1848, she married in November, 1851, the plaintiff, Bedilian. Her disability of infancy had therefore ceased in May, 1844, which was a little more than ten years before the filing of this bill, and the disability of her coverture contracted during minority had ceased four years later, that is to say, in 1848, about six years before the bill was filed. The bill prayed for discovery and account of the property of which the father died seized; and that the equitable right of her, the daughter, to the same, might be ascertained, and the property or the value thereof be decreed to her. Both the brothers, John and James, had died prior to the bringing of this suit, but neither their executors nor administrators were made parties to the bill. The defendants, however, were their heirs, and in possession of some of the original property of Thomas Seaton, the father of the girl. The case now came up on demurrer to the bill; the grounds of the demurrer being that the statute of frauds was a bar, there having been a mere promise in the case, and this promise resting in parol; that the executors or administrators of the two brothers ought to have been joined, the case being one of personal contract, and not of a trust attaching itself and cleaving to the land; and finally, that twenty-five years having elapsed since the brothers took possession of the property claiming it adversely to the plaintiff's rights, and more than ten years since the daughter had arrived at full age, the title was barred by the statute of limitations, and the claim was stale.

For the complainants it was contended that the brothers were trustees for the girl. They had, in fact, prevented their brother from making a will, not only by their assurances that he was in no immediate danger, and by the promise that if he died "Harriet should have it all, every cent;" but also by arresting his active intentions, in their entreaty that he should give himself no trouble about what he had been about to do, and had actually begun to do. "Otherwise" —to use the language cited below—he would have given himself the trouble. They stopped him.

In considering what amounts to preventing a man doing an act, an immense distinction must be made between the case of a man in active health and one who is sick and dying. In the case of a person wholly helpless every way; a person who, in the stages of expiring nature, looks imploringly and confidingly on those around him for everything he wants—where death "absorbs him quite, drowns his senses, blinds his sight" —a word, a look, is as potent as, in another cause, superior physical force would be. A sick and dying man can make no actual and personal efforts in anything. He is to be likened in this respect to a child or to a person of feeble understanding. This man, it is plain, was greatly concerned; he had sent for certain friends at a distance, supposing when he sent that he would live to receive them. He now perceived that he was failing fast. He is impressed with a sense of his own dying condition. He wants to make a will at once and before they come. He calls his brothers to his bedside—he is about to "give himself trouble." He does in fact give himself trouble. His brothers stop it. They tell him that he will not die; that if he does die it will make no difference —for that his daughter "shall have all of it —every cent." They will not let him go on with giving himself the trouble which by calling them to his bedside he had begun to take. They arrest—stop—prevent all his efforts. There were numerous persons present; some one of whom could probably have drawn such a will as the case required, and could certainly have found a person who could have done it. But all is prevented by the brothers. We need not go on the promise at all. We go on the case of a weak, dying, helpless man, arrested in what he knew were the last hours of his life, and arrested of necessity, in what he was in the very act of setting into operation. The case is stronger than Oldham v. Litchfield, 2 Vern. 506. In that case Litchfield had devised land to his brother; this brother having promised the testator that he would pay an annuity to a nephew: "Otherwise"—the case says—"the testator would have charged his real estate with the payment of it." On bill filed, the brother was made to pay the annuity, notwithstanding the statute. In the present case there can be no reasonable doubt but that "otherwise"—that is to say —but for the assurances, and the remonstrances and promises of the brothers, a will would have been made. The case in fact resembles Thynn v. Thynn, 1 Vern. 296, where Mr. Thynn had made a will, and in it had made his wife executrix. The son hearing of the will, came to his mother in the lifetime of his father, and persuaded her that there being many debts, the executorship would be troublesome to her, and desired that he might be executor. He induced his mother to ask the father to appoint him, declaring that he would only be an executor in trust for her. The father thus made the will

anew; and on a bill filed, "the lord keeper, notwithstanding the statute of frauds and perjuries, and though no trust was declared in writing, decreed it for the plaintiff."

2. As respects the non-joinder of parol representatives, we are not bringing suit for a breach of contract, but for enforcing a trust against parties not purchasers, and now in possession of the land. There were promises made to the dying man no doubt; and these come in to aid us, not as promises, but along with remonstrances and assurances—as acts which prevented a dying man from going on with what he had begun. At all events, we can amend the pleading by adding the personal representatives.

3. If the trust is plainly proved, the objection of staleness is not sufficient. The child was eight years old, when this fraud was accomplished. Her innocence and infancy are plain, and the disability is not a legal position, but an actual truth. Then before the disability of infancy had ceased, the disability of her marriage in minority with her first husband, Barry, supervened. This disability ceased only in 1848, six years before this bill was filed. There are no laches here considerable enough to be a bar.

GRIER, Circuit Justice. If the property had been devised to John and James under a parol agreement by them, that they would hold it in trust for Harriet, the case would be like that of Hoge v. Hoge, 1 Watts, 163, and numerous others, in which equity treats the fraudulent procurer of the legal title as a trustee ex maleficio.

But in this case the title of the brothers did not arise by deed from Thomas. Their title was by descent; cast upon them by the law of the land, because of the intestacy of their brother. The intention of Thomas to make a devise of his property to his natural daughter having never been legally executed, gave her neither a legal nor equitable title to it. John and James are not the fraudulent grantees of the land, and have not received or accepted a legal title in trust from Thomas. They have made a solemn promise to their brother on his death-bed; and assuming the conspiracy charged in the bill (though not substantiated in the evidence), that in consequence of that promise a will was not made, was this anything more than a parol contract of which chancery is asked to enforce the specific execution? The bill sets forth no acts or declarations from which a fraudulent intention would necessarily be inferred. The exhortation to the brother to make his mind easy, that he was not in danger of immediate dissolution, may have been made in perfect good faith and kindness. Nor does the fact that the decease took place before the arrival of the scrivener, leave any necessary inference that a will would have been made if the promise had not been made. As a naked promise, without consideration, it would not be enforced by equity in the face of the statute. As a trust it could not be, where the alleged trustee did not receive the property by some gift or devise to which a trust was annexed. Nor was the trust left out of a will or conveyance on account of any promise of the devisee or executor, as in the case of Oldham v. Litchfield, cited from 2 Vern. 505, where lands were charged with an annuity on proof that the testator was prevented from charging them in his will, by a promise of payment by the devisee; nor is the case like the other case cited from 1 Vern. 296, (Thynn v. Thynn,) where a son induced his mother, by promising to be a trustee for her, to prevail on her husband to make a new will and appoint him executor in her stead. In these cases from Vernon, the conduct of the devisee was a fraud practiced not only on the party intended to be benefited, but on the testator from whom he received the legacy or devise. A mere promise is not enough to take the case out of the statute, else the statute which requires a will to be in writing would be inoperative. The foundation of the decree is the fraud of the person who has obtained the legal estate, or other benefit under the will, by means of a promise which he never intended to perform.

II. But assuming the charges of the bill to be true and well pleaded, and that the heirs expectant, when they made this promise, fraudulently prevented the intestate from making a will in favor of his daughter; (as on a demurrer we are bound to assume) still the bill does not present a case of a trust which adheres to the title in the hands of the promisees, and their heirs or others having notice: it is but a parol promise or contract which, on account of the fraud practised on the intestate and his intended devisee, chancery will compel the heir to specifically execute, either by transfer of the property or its value to the intended devisee. But as a parol contract, and not a trust descending with the land, or a covenant binding it in the possession of the heirs, how can a bill to enforce a mere personal contract be maintained against the heirs alone? Admit that a chancellor would have compelled the brothers on a bill filed in their lifetime, to make good this promise made to Thomas in favor of his daughter, either by actual transfer of the property itself, or payment of its value. Still the remedy in equity, as at law, would be against the personal representatives, the executors or administrators of the promisors. The estates of the decedents, whether they came by inheritance from the intestate brothers or otherwise, might have been taken in execution to satisfy the judgment or decree. In this way the property inherited by the present defendants might all have been made liable as assets.

III. But assuming that the bill might be so amended by making the executors parties, if any there be, and that the claim of complainants might be relieved from this difficulty by

leave of the court, still it is met by the defence of staleness. Except in cases of direct trusts not denied, the statute of limitations is as applicable to bills in equity as to suits at law. It would be superfluous to repeat the well established doctrines of courts of equity on this subject, further than referring to Wagner v. Baird, 7 How. [48 U. S.] 234.

IV. Infancy is an involuntary disability, and would justly be considered in a case of this sort, but as in courts of law cumulated disabilities will not be permitted to hinder the running of the statute of limitations, so in courts of equity voluntary disabilities, such as coverture or absence from the state, even where not cumulative, will not be received as a defence against the charge of staleness. At all times this jurisdiction of enforcing parol trusts or parol promises to convey property, is one to be cautiously exercised. Courts of chancery proceed in these cases against the letter of the statute, on the ground of preventing frauds from being successful, by pleading the statute against frauds. But the spirit as well as the letter of these statutes would be wholly annulled, if legacies or devises not written in a will, or contracts for the sale of realty were enforced, by the vague, uncertain, and too often imaginary recollections of old women or old men after a great number of years. Those who swear to conversations are never accurate; the omission of a part of a conversation, the leaving out of a single adverb, pronoun or preposition, may unintentionally convert a partial truth into a great lie.

V. After forty years' experience at the bar and on the bench, I must say, that I think courts had better never have relaxed the stringent rule of these statutes. Courts, as well as juries, are too apt to be led away by the cry of "Fraud!" We all hate fraud, and are too willing to assume the functions of an overruling Providence, and punish it by arbitrary power. This feeling of virtuous self-complacency too often leads to hasty decisions and dangerous precedents. I have known a valuable property converted into a trust, by the testimony of an old woman who recollected and construed a nod, after some twenty-two years, into the acknowledgment of a trust. See Jones v. McKee, 3 Barr, [3 Pa. St.] 496.

The promise which this bill calls upon us to enforce against the heirs of the promisors (on the recollection of one or two old women, who do not agree with one another, nor with that laid in the bill) purports to have been made some twenty-five years ago. The disability of infancy was over more than ten years before the filing of this bill. There is no allegation of any fraudulent concealment of her rights from the complainant; no reason why she might not as well have brought her suit during the life of her first husband, as in that of her second.

However romantic the story may be, that seeks to divest men of property held in descent by the second generation, on a cry of fraud set up after all the alleged parties to it are long dead and their executors after them, I am happy to say, that the rules which govern a court of chancery in cases of this kind fully justify me in dismissing this bill as stale, and that the lapse of time appearing from the face of the bill itself is a complete bar to the relief sought.

Decree for defendants.