# CHARLESTON.

## TENNANT *v.* TENNANT *et al.*

Submitted February 1, 1897—Decided April 30, 1897.

EXPRESS TRUST— *Will—Evidence—Sufficiency of Evidence.*

Testator, at the instance of his sons M. and A., made a will devising M.'s share to A. "because my son A. has advanced to my said son M. the value of all the interest in my estate which my son M. could have but for the will, which is made in fact to enable my son M. to obtain said advance from his brother, A." In a suit by M. against A. to establish a trust in the former's favor, plaintiff testified that his interest was devised to defendant on the latter's promise to make him equal with the other children, and that said promise was not kept; while defendant swore that he purchased his brother's share outright, and paid him one thousand dollars therefor. There was evidence that before the will was made defendant advanced money to plaintiff to enable him to remove to another state, and paid some of his debts; that plaintiff returned to the State eighteen months prior to his father's death, and settled on a part of the land, and when his father died allowed his share to be partitioned to his brother, frequently declaring that it belonged to him, and for nine years after probate of the will remained on the land under sufferance of defendant, bringing suit only when the latter demanded possession. There was evidence of declarations made by defendant after testator's decease that he held the land for plaintiff, and that he afterwards agreed to convey it to him for one thousand five hundred dollars. *Held,* that a decree refusing to declare a trust should not be reversed. *By a divided court.*

Appeal from Circuit Court, Monongalia County.

Bill by Milton Tennant against Asa Tennant and others

to declare a trust. From a decree dismissing the bill, plaintiff appeals.

*Affirmed by a divided court.*

R. L. BERKSHIRE and GEO. C. STURGISS, for appellant.

CHAS. POWELL and U. N. ARNETT, JR., for appellees.

DENT, JUDGE:

Milton Tennant appeals from a decree of the Circuit Court of Monongalia County rendered in a chancery suit wherein he was plaintiff and Asa Tennant, his brother, was defendant, and assigns as error the dismissal of his bill without granting the relief prayed. The following is a statement of the case: On the 1st day of March, 1880, at the instance of his two sons, Milton and Asa, Jacob Tennant made his will, which is as follows: "I, Jacob Tennant, of Monongalia County, West Virginia, being of sound and disposing mind and memory, do make, publish, and declare this my last will and testament in manner following; that is to say: That after my death, and the payment of all my just debts and funeral expenses, my estate, real and personal, of every kind, wherever and however situate, shall be divided. into such number of equal parts as shall be equal to all my children who or whose descendant or descendents shall be living at the time of my death, always including in such enumeration my sons, Asa and Milton, whether they, or either of them, or any descendant of either, be living at the time of my death or not; and that two of such equal aliquot parts be given to my son Asa, or, in case he shall have died, to his heirs at law. Second: That one of such equal or aliquot parts of my estate be given to each of my other children (or to their descendants in case any of them shall have died before me leaving descendants), always excepting and excluding my son Milton and his descendants; the true intent and meaning of this, my will, being that my son Asa shall represent both himself and my son Milton in the distribution of my estate, both real and personal; and that subject to this provision and intention my estate shall pass to my children and their descendants just as the same would pass at law; and the reason of this is not that I discriminate against my son Milton, nor favor my son Asa, but because my said son

Asa has advanced to my said son Milton the value of all the interest in my estate which my son Milton could have but for this will, which is made in fact to enable my said son Milton to obtain said advance from his brother, Asa, and with the understanding had in my family that this will is necessary and proper to secure an equal division amongst my children, and that the same shall never be revoked. Witness my signature and seal this first day of March, 1880. Jacob X Tennant. [Seal.] Witnesses: Henry
his
mark
P. Wilson. [Seal.] Ira Bailey. [Seal.]" Milton Tennant insists that he was about to move permanently to Texas, and it was agreed between himself and Asa that the latter was to have his share in his father's estate, and pay him therefor its value in money; that he did go to Texas, and, after staying about three years, returned, and settled down on his father's land, he still being in life; that his father died in July, 1884, and the will was probated, and shortly afterward the land was divided, and two shares were allotted to Asa in accordance with the provisions of the will, but that plaintiff was permitted to take possession of one of the shares, containing about ninety-one acres, as his own, and held the same until the institution of this suit, repaying Asa with grain, *etc.*, any taxes paid by him; that Asa had never paid him his share in the estate, or any part thereof, but had conceived the intention of holding the appellant's share by virtue of the will without recompensing him therefor in accordance with the agreement made with his father to make appellant equal with the other children, and had brought suit to dispossess him. Asa, on the other hand, claims that the appellant agreed to take one thousand dollars for his share, without regard to the question of equality, and that he had fully paid the same, or secured it to be paid at the time; that when the land was partitioned he rented one share thereof to the appellant, who accounted to him for the rent, and that he has always paid the taxes thereon; that at the instance of appellant he offered to let him have the land for one thousand five hundred dollars, which sum he claimed it would take to make him whole, and appellant agreed thereto, but, failing to make such payment, he brought suit for possession. Appellant says the agreement was that the price he was

to pay to retain the land was one thousand five hundred
dollars, less the price of eleven and one-fourth acres,
sold to Peter Youst, and damages received for a county
road and rental for oil lease and pipe-line were to be de-
ducted, which Asa denies. What the contract or agree-
ment was between the parties at the time the will was
executed is not all satisfactorily established, there being
no memorandum or statement thereof in writing, other
than what the will contains. Asa alleges that he was to
pay one thousand dollars to appellant, but he entirely
fails to establish such to have been the contract. There is
no evidence but his own in relation thereto, which is con-
tradicted by the appellant, who is supported by the lan-
guage of the will. The evidence, as it appears in the
record, decidedly preponderates against the full payment
by him of the one thousand dollars, and yet appellant ad-
mits as a matter of compromise he agreed to repay him one
thousand five hundred dollars, less certain deductions
heretofore mentioned. The terms of the will is the only
written evidence as to the contract between the parties,
and they are in these words: "And the reason of this is
not that I discriminate against my son Milton, nor in favor
of my son Asa, but because my said son Asa has advanced
to my said son Milton the value of all the interest in my
estate which my son Milton could have but for this will,
which is made in fact to enable my son Milton to obtain
said advance from his brother, Asa, and with the under-
standing had in my family that this will is necessary and
proper to secure an equal division amongst my children,
and that the same shall never be revoked." The consider-
ation for the will is the value of all the interest of the ap-
pellant in the estate of the testator, no part of which is
pretended to have been paid at the time of the execution
of the will, and it therefore furnishes no evidence of pay-
ment.

It is a well-established principle of equity jurisprudence
that where a person obtains a devise or bequest in his own
name on promise to hold it for the benefit of another, the
nominal devisee will be held to be a trustee, and the be-
quest a trust for the benefit of such other. As is said in
the case of *Church* v. *Ruland*, 64 Pa. St. 442: "This doc-
trine fastens upon the conscience of the party having thus

procured a will, and then fraudulently refusing or ne-
glecting to fulfill the promise on the faith of which it was
executed, a trust or confidence which a court of equity will
enforce by compelling a conveyance when the proper time
for it has arrived." Also: "The trust insisted on here,
however, owes its validity not to the will or the declara-
tion of the testator, but to the fraud of the devisee. It
belongs to a class in which the trust arises *ex maleficio*, and
in which equity turns the fraudulent procurer of the legal
title into a trustee to get at him." The fraud consists in
the breach of duty and obligation on the part of the nom-
inal devisee. Story, Eq. Jur. § 781 : "In the case of *Old-
ham* v. *Litchford*, 2 Vern. 506, it being proved that the
devisee of certain real estate had promised the testator
that he would pay an annuity, which otherwise the testator
would have charged on the real estate devised, it was de-
creed that the annuity should be charged on the land."
In this case the appellee obtained a devise of property
which would otherwise have been devised to the appellant
on the promise of payment to the appellant of the value
of the interest devised. His after-refusal to do so justifies
a court of equity in charging upon the property devised in
favor of the appellant the value thereof, or in holding the
appellee as a trustee for his benefit, giving him the choice
to pay the value or surrender the property. *Williams* v.
*Vreeland*, 29 N. J. Eq. 417; also 32 N. J. Eq. 135, note.
Nor does the fact that the will may have been made in
such manner to secure the value of the appellant's inter-
est to himself and prevent his creditors from seizing the
same render the same fraudulent, as the testator had the
right, without being guilty of fraud, to secure the appel-
lant's inheritable interest in such way as to prevent it
being taken by his creditors. In *Jones* v. *McKee*, 3 Pa. St.
496, (6 Pa. St. 425),—a case in which a son, being financially
embarrassed, persuaded his mother to give all her lands
by codicil to her will to his sister, who would hold one-
half of such devise in trust for him, to which the sister
being present assented,—held, that the sister was a trustee
for her brother as to one-half the lands, and that subse-
quent parol admissions of the sister were admissible to es-
tablish the trust. So, in this case, the admissions of the
appellee, and his willingness to deed the land to the appel-

lant on being made whole, is competent testimony to establish the provision of the will as creating a trust in him for the benefit of his brother. Nor is the parol agreement entered into by them in violation of the statute of frauds, for it amounts on the part of the appellees to nothing more than an agreement to execute his trust, which he was equitably bound to do. Where one agrees verbally to do that which he is already under legal obligation to perform, such agreement is not rendered invalid by the statute of frauds. The parties thereto seem to have misunderstood each other as to the terms of the agreement, and therefore, their minds never having met, it was not a binding contract, but operates as a mere evidential admission of the trust.

From the language of the will it is plain that the testator was induced by the devisee to make it on assurance that he would satisfy the appellant in such way as to secure him an equal share with the other heirs. He now claims he purchased the interest outright for one thousand dollars, and, if he could have proven such to have been the arrangement agreed to by the testator and accepted by the appellant, and that such consideration was fully paid, he would be entitled to prevail. But, as heretofore shown, this he utterly failed to do. Having failed to show a full compliance on his part with the conditions on which he received the devise, the court should have held him *pro tanto* a trustee as to such devise, and holding the same for the benefit of the appellant; that is, until the appellant was made equal in all respects with the other heirs or devisees, as the plain object of the testator was to secure such equality. For this reason I am of the opinion the decree complained of should be reversed, and this cause remanded to the circuit court, with direction to ascertain, by reference to a commissioner or otherwise, what sum will be required to make the appellant equal in all respects with the other devisees of Jacob Tennant, deceased, and charge the same on the land in controversy, or, in case the said appellee so elects, ascertain the amount necessary to make him whole as to such sums paid by him under his agreement with his father, and require him to execute a deed to the appellant for said land on repayment of the said amount necessary to make him whole. In which McWhor-

TER, JUDGE, concurs; but ENGLISH, PRESIDENT, and BRANNON, JUDGE, being of the opinion the decree should be affirmed, it so stands.

BRANNON, JUDGE:

I cannot consent to reverse the circuit court in this case. The first question presented is, what kind of a trust exists in favor of the plaintiff, if any? As Asa Tennant is not shown to have been guilty of fraud in the procuring of the devise in his favor,—I mean that act itself,—it occurred to me that on the basis of fraud there could be no trust. I know it is laid down that one who procures property by fraud is a trustee for the injured party. *Coleman* v. *Cocke*, 6 Rand. (Va.) 618. I thought that on the basis of mere fraud a trust could not be erected, unless the devise itself was procured by fraud, and that the mere breaking of a promise to make the party equal with money would not erect such a fraud, but be ground of action at law. I find much authority to sustain this position. In *Hoge* v. *Hoge*, 1 Watts, 163, Gibson, C. J., reviewed this question, and it was held that a devise would be a trust when followed by evidence that it was obtained by the fraud of the devisee, and he said that a mere refusal to perform the trust is undoubtedly not enough, and it was necessary that there should be in the party an agency, active or passive, in procuring the devise; and he cited *Whittan* v. *Russell*, 1 Atk. 448, in which it was thought by high authority that even a promise to the testator to perform the trust was not such an agency, because the fraud, if any, there consisted not in the procurement of the will, but in the subsequent neglect to perform the trust, and that every breach of promise is not a fraud. And 2 Minor, Inst. 226, seems to deem it essential that there must be fraud in obtaining the conveyance to make the party a trustee. 2 Pom. Eq. Jur. § 1054, says: "Whenever a person procures a devise or bequest to be made directly to himself (and thereby preventing, perhaps, an intended testamentary gift to another) through false and fraudulent representations, assurances, or promises that he will carry out the original and true purpose of the testator, and will apply the devise or bequest to the benefit of the third person who is the real object, and who would otherwise have been the actual re-

cipient, of the testator's bounty, and after the testator's death he refuses to comply with his former assurances or promises, but claims to hold the property in his own right, and for his own exclusive benefit,—in such case equity will enforce the obligation by impressing a trust upon the property in favor of the one who has been defrauded of the testator's intended gift, and by treating the actual devisee or legatee as a trustee holding the mere legal title, and by compelling him to carry the trust into effect through a conveyance to the one who is beneficially interested. It is not necessary that the representations, assurances, or promises of the actual devisee or legatee should be in writing; they may be entirely verbal. There are a few cases which seem to hold that a trust will arise under these circumstances from a mere verbal promise of the devisee or legatee to hold the property for the benefit of another person. This position, however, is clearly opposed to settled principle. The only ground upon which such a trust can be rested, and is rested by the overwhelming weight of authority, is actual intentional fraud." It will be found laid down upon authority in *Towles* v. *Burton*, 24 Am. Dec. 409, and the appended note thereto, discussing this subject, that where one is induced to refrain from making or altering his will so as to give a bequest or make other provision for a person for whom he wishes to provide, by the promise of the heir or devisee or legatee under the will, to make such provision himself, and the promise is not performed, equity will charge the promisor as a trustee on parol proof of the promise, in favor of the person for whose benefit it was made. In *Langtry* v. *Langtry*, 2 Am. Rep. 310, the Illinois court held that, if one voluntarily conveys land to another, the latter having taken no measure to procure the conveyance, but accepting it, and verbally promising to hold the property in trust for C., the case falls within the statute of frauds requiring a trust to be expressed in writing, and a court of equity will not enforce the promise. But it was said that if the grantor was intending to convey the land directly to C., and B. interposed, and advised A. not to convey it to C., but to convey it to him, promising, if A. would do so, he would hold the land in trust, chancery would lend its aid to enforce the trust upon the ground that B. obtained the title by fraud-

ulent imposition upon A. The distinction, said the court, may seem nice, but it is well established. In the one case B. had no agency in procuring the conveyance; in the other he has had an active and fraudulent agency. In the one case he has done nothing to prevent a conveyance to the intended beneficiary; in the other he has, by false promises, diverted to himself a conveyance about to be made to another.

Pomeroy, in note to section 1054, states that the majority of the recent decisions do not insist on actual fraudulent intention on the part of the devisee or legatee as necessary to the creation of a trust of this kind. In *Bedillian* v. *Seaton*, 3 Wall. Jr. 279, (Fed. Cas. No. 1,218,) it was held that not only will no trust arise from a mere verbal promise to the testator, however solemn, but none will arise from a fraudulent promise; only a contract which equity will enforce. So it seems that there is a great conflict on the question whether there must be actual intention of fraud in the procurement of a devise to create a trust. Now, where the statute of frauds requires a declaration of trust to be in writing, I would think that it would require actual fraud in the procurement of the act to erect a trust. A promise to do certain things would clearly create a ground of action at law for its breach, but, where the statute requires a trust to be declared in writing, a mere oral promise would not do so. You would have to take it out of the statute of frauds on the ground of fraud in the very procurement of the deed or devise. But when I come to think, as our statute of frauds does not require a writing to create or prove a trust in real or personal estate, the trust here alleged to exist is simply and only an express or direct trust, not a constructive trust. If Asa Tennant did promise to accept that devise, and hold the land in trust for Milton, or to give him such part as would make him equal in land, or to make him equal in money, it would doubtless be an express trust, for an express trust means a trust created by words, either expressly or impliedly evincing an intention to create a trust. 27 Am. & Eng. Enc. Law, 3; Hill, Trustees, 55; 1 Perry, Trusts, § 73. There is no earthly need, to sustain the trust here alleged, to place it on the ground of a trust *ex maleficio*,—that is, on the ground of fraud in the procurement of the devise,

—for, if Asa promised to take that land for the purposes stated, he is under an express trust beyond all question, though without writing. *Currence* v. *Ward*, 43 W. Va. 367 (27 S. E. 329) ; *Nease* v. *Capehart*, 8 W. Va. 95.

But is there a trust? Here it is settled that to establish an express trust the evidence must be clear and decisive. Loose and indefinite expressions will not do. Hill, Trustees, 59 ; *Phelps* v. *Seely*, 22 Grat. 573. To fix upon a man who has been given title to land absolute on the face of deed or will a trust, and thus take away from him his property, or right conferred, you must fix the trust upon him by unquestionable and full proof ; and, if you place the trust upon the ground of fraud, the law is, as stated in Underh. Trusts, 187 : "That being a jurisdiction founded on personal fraud, it is incumbent on a court to see that a fraud or *malus animus* [evil mind] is proved by the clearest and most indisputable evidence. It is impossible to supply presumption in the place of proof." I do not think an express trust is clearly proven. Asa Tennant says that before his father made his will, by agreement between him and Milton, Milton, who wanted to move to Texas with his family, sold him his interest, he soliciting the transaction, at one thousand dollars, which he paid him. Milton says he did not sell him his interest, but that his interest was to be devised to Asa under the promise that he was to make him equal with the other children, either in land or money, as he might choose. Which is the true version? I think it clear that the will does not create a trust, or furnish evidence of it, for it declares as the reason for giving Asa two shares that Asa had advanced to Milton "the value of all the interest in my estate which my son Milton could have but for this will, which is made in fact to enable my son Milton to obtain said advance from his brother, Asa, and with the understanding had in my family that this will is necessary and proper to secure an even division among my children, and that the same shall never be revoked." Why does he say it "shall never be revoked"? Because this arrangement had taken place between the two brothers. The father did not intend that Asa should be afterwards deprived of what he gave Milton. Asa swears that he expressed to his father and to Milton a solicitude when they proposed to him to buy and advance

the money on Milton's interest, that he told them he did not want to lose by it, and was reluctant to accept the proposition; but his brother had been unfortunate in business, and was almost penniless, and he did accept it. This clause seems to confirm this statement of Asa's solicitude; for it inhibits any effort to change that will. It declares, instead of a trust, that Asa had advanced to Milton his full share. Now, some declarations made by Asa after his father's death are adduced to sustain this trust; a few declarations that he held the land for Milton. I know of no other evidence to prove this trust, unless you cite Asa's agreement afterwards to convey this land to Milton at one thousand five hundred dollars, cited against him for the purpose of proving the existence of a trust, when the fact that the agreement fixed one thousand five hundred dollars negatived the idea of a trust, and besides it was nothing but a proposition made in an attempted compromise going on just before this suit between the two brothers. Asa, for peace, offered to sell his brother this land for one thousand five hundred dollars. It was no recognition of an existing trust. But *per contra* take the declarations and the actions of Milton himself. They show that he was not to have the land itself at any rate. Frequently Milton said that it was Asa's land. When the lands of his father were partitioned, he was a party, and carried chain in the work of partition, and said to the commissioners he had no interest in the estate. When a road was being opened through the land, he swore before the county court that it was Asa's land. He knew of a deed by which Asa sold eleven and one-fourth acres of it, and was present when he received the money for it, and made no objection; and on another occasion he said that if he had offered to buy the land of Asa for a little home, Asa would not have given him the chance to pay for it that he gave Youst. When Coss wanted to buy the timber on the land, Milton referred him to Asa, saying it was Asa's land, though he was in possession at the time, and urged Coss to buy the timber, and he would haul it, and take some furniture in pay. He knew that Asa rented to Eddy part of the land for buckwheat, and that he received the rent. He was asked by Coss who owned the land, and answered that Asa did, and, when asked what rent he

paid, answered that he helped Asa to put up the grass and wheat, and kept up the fence on the farm, but answered no further as to rent. Why did he not repudiate then all idea of renting? Asa used the land year after year for pasturing and otherwise, save the small part occupied by Milton. Wilson, a witness to the will, asked why Asa got two shares, and the father said that Milton was going to move to Texas, and Asa had bought his interest in the estate; and Milton, being present, said, "Yes; that is just the way of it." Bailey, another witness to the will, verifies Wilson's statement as to what the father said, but says he cannot say whether Milton "was just present in the room at the time or not." Jacob Tennant declared to Morris that Milton was embarrassed with debt, and was going to Texas, that Asa had bought his interest, and paid him for it. This is, perhaps, incompetent evidence. Kent's evidence shows that in 1892 Asa and Milton were negotiating a sale of the land to Milton for one thousand five hundred dollars, and Milton agreed to pay that. Why so, if he was the owner of the land? Milton told Ice and Conway that he had no interest in his father's estate. In the partition the land was assigned to Asa. Asa paid the taxes on it year after year. It seems he leased it for oil purposes. Now, it seems to me these indisputable circumstances repel the idea of a trust to hold the land itself for the use of Milton. They show that he had no interest in the land. Asa says that when his brother was going to Texas with his family, he purchased him his railroad tickets, assumed certain debts for him, and paid him the balance three hundred and seventy dollars in cash. Is this true? This will of the father states that Asa had advanced the money. Milton was insolvent, and was going to Texas, and did go. What more likely than that he would sell out to his more prosperous brother his interest? That Asa did go to Fairmont, and buy the railroad tickets, is unquestionable. But Milton says he paid seventy-five dollars on them himself, and his father furnished the residue of the money. Very unreasonable that the father would furnish money for this purpose when he knew that Asa, as he says in his will, had purchased the interest. We know certainly that Asa assumed three hundred and forty-four dollars debt for Milton, and took up Milton's note. Mil-

ton says that his father borrowed this money of one Billingsly. It seems unreasonable that he would do so. Asa swears, and other evidence corroborates him, that he borrowed the money of Billingsly, and repaid it to him. Strange that the father would borrow the money to pay Milton's debt, if it was true, as the will states, that Asa had advanced the full value of Milton's interest. We know, too, that Asa paid another creditor one hundred and fifty dollars. True, Milton says, and a witness corroborates him, that he handed this money to Asa just before he started to Texas. That might be out of money that Asa had paid him. It is utterly denied by Asa under oath. Where did Milton get the money to carry himself and his family to Texas? He was insolvent. Is it not likely that Asa furnished it, as he swears he did? I wish to know why Asa paid this money, if his story is not true. When we know he purchased these tickets, and paid the one hundred and fifty dollars cash to a creditor, would we not rather attribute it to such a purchase, as Asa asserts, than that Milton, insolvent as he was, furnished the money? This strongly corroborates what the father, said in his will, —that Asa had advanced Milton the full value of his share.

Milton came back from Texas, and settled on his father's land, eighteen months before his father's death. He was still insolvent; more needy, perhaps, than before he went. There he lived close to his father and close to Asa. He did not claim the land, but, instead of that, after his father's death, saw it given to his brother, and made all the declarations admitting Asa's property in the land I have before referred to. Strange that he would, in his poverty, admit such to be the fact if it were not so. If he owed any debts, they were barred by the statute of limitations, and that would not induce him to deny his ownership. And if Asa had not settled with him for his interest, would he not have gone to his father during these eighteen months, and complained of his brother's delinquency, and would the father have rested easy on his bed, day or night, while Asa was perpetrating this injustice? No, he would have burned his will, and made another, giving Milton his share. Never would the old father have allowed this injustice so long, especially as he was ageing, and very soon to depart. He

would have been prompt and eager to do the right. It was upward of four years from the date of that will, certifying that Asa had advanced Milton his full share, until the father's death; and, if Asa had not paid Milton for his interest for so long a period, would we not have heard of it? Milton swears that he did complain to his father. Is this so? That would make us all the more certain if he did that the father would have righted this wrong. Knowing of it, he would not have tolerated it. Again, the will was proven August 9, 1884, Milton present, and moving for its probate, though it gave all his share to Asa. This bill was filed in May, 1893. For nine years after the father's death he remained on that land under the mere mercy and sufferance of his brother, and never until 1893, when his brother demanded possession of the land, did he bring this suit. Strange that he would delay so long in taking some step to make safe his right. Strange, poor as he was, that he would rest easy so many years, and Milton using the great bulk of the land in question. How could he afford to do so? Is it probable that he would have done so? Milton denies that he sold Asa his interest. The father's will declares so, and the father's declaration, made at the time of the execution of his will, and in the presence of Milton, sustains Asa. The mother of the two boys was examined. She exhibits great reluctance to testify between these two clashing sons. She says that the children, in lieu of letting her have land while she lived, each agreed to pay her ten dollars a year. When asked how it came that Asa paid her twenty dollars, she said that would have been his share the way the children made the bargain. Why should Asa pay his mother ten dollars for Milton's share, if Milton owned the land? Milton never paid her any rental. There is evidence tending, I think, very inadequately to sustain the plaintiff's case; but the facts and circumstances above—not merely oral evidence of witnesses, but facts and circumstances beyond dispute—side with the decree entered in Asa's favor in this case. The evidence of the two brothers is in square conflict, and that evidence is most material. The circuit judge has found in favor of Asa's version, supported as he is by so many circumstances of natural probability. The burden of proof is on the plaintiff. Do they not cast doubt upon the ex-

istence of an express trust? The circuit judge has found against it. Can we say the evidence to establish the trust is so plain as to call for his reversal? And as to any fraud in the procurement of the devise itself, there is no evidence. And can we say that amid this conflicting evidence and these circumstances strong against Milton, there is any money yet owing to him from Asa, and that Asa's version of having purchased his interest out and out, and paid him for it, is not true? The circuit judge has found that it is true and that question rested on inferences from circumstances, conflicting oral evidence, and the credibility of witnesses in direct conflict. I think the case was decided right; but I feel at least clear in saying that it is not so manifestly wrong as to warrant a reversal. Different men might differ in the case, but that is no reason for reversal. *Richardson* v. *Ralphsnyder*, 40 W. Va. 15 (20 S. E. 854).

And, further, as to delay. Where one has to call on equity to enforce a mere executory right, as to declare a trust, not to enforce an acknowledged trust, it is an invariable rule that he must come promptly. *Clarke* v. *Hart*, 6 H. L. Cas. 655. And if you put relief on the ground of fraud in getting the decree, it is clearer yet that nine years' laches, with full knowledge of right, would bar. *Whittaker* v. *Improvement Co.*, 34 W. Va. 230 (12 S. E. 507); *Harwood* v. *Railroad Co.*, 17 Wall. 78.

*Affirmed.*