OF THE

# SUPREME COURT OF APPEALS

## OF WEST VIRGINIA.

## Fall = Special Term, 1896.

## CHARLESTON.

WARD *v.* WARD.

Submitted June 10, 1896—Decided December 16, 1896.

DEED—*Delivery of Deed—Burden of Proof.*

    The possession of a deed duly executed and acknowledged, with all the formalities required by law, is *prima facie* evidence of its delivery; and when a father seeks to set aside such deed to a son, on the sole ground that the son wrongfully came into possession of it, the burden of proving such wrongful possession is upon the father. (p. 2.)

Appeal from Circuit Court of Barbour county.

Bill by Acquilla J. Ward against Taylor Ward. Decree for plaintiff. Defendant appeals.

*Reversed.*

JOHN BASSEL and S. V. WOODS for appellant.

DAYTON & DAYTON and F. O. BLUE for Appellee.

DENT, JUDGE :

Acquilla J. Ward filed his bill in chancery in the Circuit Court of Barbour county, seeking the cancellation of a deed made to his son Taylor Ward, bearing date the 10th day of January, 1885, and conveying, after the father's death in consideration of five thousand dollars, a certain valuable farm, known as the "Al. Ward Farm," in said county. Taylor Ward filed his answer, denying the allegations of the bill to which plaintiff replied generally. Many depositions were taken, and, on a final hearing, the Circuit Court entered a decree canceling the deed as a cloud on the plaintiff's title. From this decree the defendant appeals.

The single question presented for our consideration is as to whether the deed was fully consummated by delivery. There appears to be no dispute as to the law, but it is recognized to be as laid down by this court in the case of *Davis* v. *Ellis*, 39 W. Va. 226, (19 S. E. 399), following *Lang* v. *Smith*, 37 W. Va. 734, (17 S. E. 213) ,and *Newlin* v. *Beard*, 6 W. Va. 120, and is to the effect that where the grantor parts with the possession of the deed to the grantee or his agent, reserving no right to recall it or alter its provisions, the delivery is effectual, and the grantee succeeds to the title. "When the deed is found in the possession of the grantee, a delivery is presumed to have been made by the grantor and it devolves upon the grantor who denies the delivery to rebut such presumption." 5 Am. & Eng. Enc. Law, 447; *Ward* v. *Lewis*, 4 Pick. 518, and other cases therein cited; also, *Newlin* v. *Beard*, *supra*. The investigation is narrowed down to the mere question of fact as to whether the plaintiff, on whom the burden of proof devolved, has established a non-delivery of the deed in controversy. The allegation of the plaintiff's bill relating to this subject is in these words : "Further complaining, plaintiff says that after his removal to his said son's upon the death of his first wife, said deed, for said 406 acres of land, which had never been delivered, was taken by him with a large number of other valuable notes and papers, and left by him in the care and keeping of his daughter-in-law, the wife of said defendant, for safe keeping only, and to be delivered to him (plaintiff) alone,

when asked for. Three years and a half almost after the preparation of said deed, after it became known that plaintiff contemplated marrying again, the said defendant, Taylor Ward, wholly without the knowledge and consent of plaintiff, procured, in some manner wholly unknown to plaintiff, the possession of said deed, and secretly, on the 9th day of July, 1888, caused the same to be admitted to record in the county court clerk's office of said county. Of the recording of said deed, plaintiff knew nothing for months after, and he charges that the said Taylor Ward sought to keep the same a secret from him. When he asked for said deed from the said wife, in whose custody the same was left, he was informed by her that she could not find it;" and, in relation to the making of said deed, he said in these words: "That on the 10th day of January, 1885, thinking to make an arrangement and such disposition of his estate, looking to the uncertainty of life and to the certainty of death, as he deemed a prudent man should make, he called upon an attorney, and caused to be drawn and prepared—First, the deed to his son, the defendant, hereinafter more particularly set forth; and, Second, his last will and testament, by which he made final disposition of his property. The whole object of this plan and arrangement on his part, wholly voluntarily, was to settle his affairs, and make such disposition and distribution before and after his death as he desired among his said wife and children. By said deed, prepared on said 10th day of January, 1885, and acknowledged at the time before the attorney who ordered the same, he being a notary of said county (as also said will was at the time witnessed by him and another called in for the purpose), he conveyed to said Taylor Ward what was commonly known as his 'Albert Ward Farm,' containing 406 acres, more or less, situate in said county, and very valuable, worth at least, $13,000 to. $16,000; that said deed on its face purports to be in consideration of $5,000 in hand paid, and retains the entire use and control of said land for and during plaintiff's life, in him, the said plaintiff."

The denial of the defendant's answer to the allegation of the plaintiff's bill relating to the delivery of the deed is as follows: "Respondent indignantly denies that he procured the deed in the bill mentioned in some way unknown

to plaintiff, and he also denies that the same was ever left with his wife for safe-keeping until the same should be called for, but, on the contrary, the same was delivered to respondent by the plaintiff, on the same day when he returned with it from Philippi, where he had gone to have the same prepared; and, when the same was delivered to respondent, he inquired of plaintiff if he had considered that well, and if he was not afraid that he would want that land himself; whereupon the plaintiff informed him that he had kept a life estate in it, which was as long as he would want the land, and that he had always intended the same for respondent, because he had been a good son, and had done more to help him along than any of his children, and at the same time the plaintiff requested respondent not to admit the said deed to record for a few years, and assigned as a reason that the recording of the paper might 'hurt him in his business'; whereupon respondent agreed that he would not record the same, and did not do so, until July 9, 1889, and only did it then because he learned on every hand that plaintiff was saying that, if he got that deed, he would destroy it, and that he had been consulting an attorney to know if the deed 'would stand,' whereupon, as a matter of precaution, respondent did have the same recorded."

In his testimony, the plaintiff entirely abandons the allegations of his bill, and says, in answer to the question propounded by his attorneys, "What did you do with the deed to Taylor Ward for the Al. Ward farm?" "I handed it to his wife, and told her there was a paper I wanted her to keep for me until I called for it." On cross-examination, the plaintiff develops an exceedingly poor recollection with regard to the disposition of the deed, but says: "I took the deed, and gave it to his wife, either that day or the next; and she was there at my house." "It was in my wife's sick room." "I can't say who all were there." "There may have been two or three present." "I can't recollect whether Taylor was there." "He might have been there." "They were living in their own house. They never lived with me. She was coming every few days to wait on my wife." "I told her there was a paper I wanted her to take and keep for me. She took it home with her to her own house." "I never saw that deed after

I gave it to her until I saw it on record here, in the clerk's office." And he admits that he never called for it until four years afterwards, when, in accordance with the advice of counsel, he took a witness by the name of Winny Wilson, and, in the absence of Taylor, went to his house, and asked his wife to let him see the deed he had left with her for safe-keeping. On being asked if the delivery of the deed did not occur in the manner detailed by Taylor and his wife, he answers: "I have no recollection of anything like that taking place there. I know distinctly of handing her a paper, and telling her to keep it until I called for it." The evidence of the defendant, corroborated by his wife, as to the manner, time, and place of the delivery, is, in his own language, as follows, to-wit: "Answer 7. That was the very day that he brought the deed home from Mr. Dayton's office. He brought to his house, at A. J. Ward's house. My wife and I were there at his home. I was sitting by a stand table, reading a newspaper. And, after he had eaten his dinner, he sat down on the opposite side of the stand from me, and pulled a paper out of his pocket, and handed it to me, and says, 'Here, I have deeded Ira Ward the Worth Ward farm.' Says, 'I have got one for you, too,' he says; and I asked him what that was, and he said a deed for the Al. Ward farm, and he took out of his pocket, and handed it to me, and I told him he had better keep it. He said he had kept the land as long as he lived; that he had reserved the life estate for his life, as long as he lived. Says he, that, 'when I am done with it, I intend for you to have the land. You are to have it when I am done with it.' I said to him he had better keep it; he might change his mind before he died; somebody else might be that he would want to have it. He said, 'No; I intend for you to have the land,' and he handed me the deed. I took the deed, looked at it, and laid it down on the stand. When I got up, and walked away like, he picked it up, and handed it to my wife like, and told her to take it. My mother said, 'Take it, Libby; you and Taylor have done more for us than any of the rest of the family, and you might as well have it as anybody.' She took it then and handed it back to me, and I put it in my pocket, and took it home with me; and I have had it ever since. After I had set down again, he told me he had put

a consideration of five thousand dollars in the deed. I told, 'you don't expect me to pay five thousand dollars, do you?' He said he did not; he had receipted me for it in the deed; but that he would give me a receipt if I wanted it then. I say that I am telling the truth. I would not tell a lie for the land. I said in the start that I would tell the truth about this matter; that I didn't want anybody to swear a lie for me. I say this because my father is sitting here, shaking his head at me, and his finger. He did it at my witnesses all the way through. That is about all that was said that day that he delivered the deed to me."

If that was all the evidence in the case, the plaintiff would necessarily fail, as the allegation of his bill is not only not sustained, but disproven, by his own testimony. He also proves the delivery of the deed to the wife of the defendant, which is a good delivery to him, for the reason that his wife is his agent as to the possession of his property, and has the legal right to receive and hold the same for her husband. He says, however, that he delivered it to her for a special purpose, and thereby made her his agent. The presumption of the law is against him, and he must rebut this presumption by a preponderance of testimony. In this he has not succeeded, as the testimony of the defendant and his wife must be considered, at least, equal to the plaintiff's testimony. The plaintiff took the depositions of numerous witnesses to prove that the defendant said on different occasions that he refused to take the deed from his father when he first offered it to him, and that his father then gave it to his wife to keep. This testimony, in the main, instead of contradicting, sustains, the defendant and his wife. The defendant, on the other hand, shows, by numerous witnesses, admissions of his father tending to support the delivery of the deed. It is sufficient to say that the oral testimony, as a whole, preponderates in favor of the defendant.

There are circumstances surrounding this transaction that throw more light upon it. One is the attempt of the plaintiff, after he had changed his mind, to "prepare" his testimony. Without letting his son know anything about it, and in his known absence, he takes a witness along with him, and visits the wife of the defendant, and, catching her unawares, asks her for the deed he left with her.

He knew at this time that the deed was on record, and not in her possession, and his sole object appears to have been to get some unexpected admission out of her that he could use against his son. His son, when he heard it, was justly indignant that they, in the language of Samson, should attempt "to plow with his heifer." His father's only excuse for so doing was that he was acting in accordance with his instructions. The plaintiff also tried to get his daughters to influence defendant to give up the deed, and, as an inducement, insisted he wanted the land back, that he might deed it to them. When the defendant was approached on the subject, he said, if his father wanted it deeded to the girls, he would do so. But the plaintiff would not agree to this, but said, if he had the land back he "could marry Betty West." This is the old, old, and oft-repeated story, where a man and his wife have spent the summer of life together, have reared a family of boys and girls to maturity, and, by their mutual labors and the assistance of their children, have accumulated a considerable estate, and now, as they are growing old, and the autumn is verging into winter, the weaker and probably overworked vessel, no longer able to resist the infirmities of nature, takes her bed for the last time. She feels that her days are numbered, but before she departs, she insists that her husband shall do justice to her children. He, ready and willing to please her, and make her last moments happy, hastens to a lawyer, has him draw up a deed to his son Ira for one farm; another deed to his son Taylor for another farm, in which he retains a life estate and his home farm also, that he may be secure in a home in his wifeless old age; then he has a will prepared providing for his four daughters, all of whom are married. The will he leaves with his lawyer, but the deed he takes with him, and hurries homeward. At the bedside of his dying companion, he finds his favorite son, and not less favorite wife, keeping affectionate watch and care. Having satisfied his appetite, he enters the room to make them all happy. He first takes Ira's deed, and says, "Taylor, I have deeded Ira his farm." Then he takes out another deed and says, "Taylor, I have got one for you, too." "I have deeded you the Al. Ward farm, but have reserved a life estate in it. When I am done with it, I intend that you

shall have the land." But Taylor, modest and over-whelmed with his father's generosity, hesitatingly replies: "You had better keep it. You might change your mind, and might want some one else to have it." "No," he replies; "I intend for you to have the land," and hands Taylor the deed. Taylor takes it, but, still undecided what to say or do, lays it down on the stand. The father picks it up, hands it to Taylor's wife, and tells her to take it. The mother, from her sick bed, rejoicing in their joy, says, "Take it, Libby; you and Taylor have done more for us than any of the rest of the family, and you might as well have it as any body." The daughter-in-law then took the deed, handed it to her husband, who put it in his pocket, and took it home with him when he went, with the understanding that he was not to put it on record for a time. This is true to human nature, and in accordance with the ordinary conduct of human beings—while the story related by the plaintiff, that he did not mention the deed to his son Taylor, but simply handed it, at some unrecollected time, to his daughter-in-law, telling her, "Here is a paper; keep it for me until I call for it," bears on its face the manifest appearance of after consideration; for if he did not intend to deliver the deed, Taylor not being entitled to the land until after his death, why did he not include it in his will, written at the same time, and save the execution of two separate instruments? Evidently, a change in his circumstances has produced a change in his mind. The wife he sought to please is under the sod, and promises made to those who lie in a graveyard soon lose their binding force when there is no eye to see, no ear to hear, no heart to feel. In her presence he thought to wind up his business, see that his and her children were well fixed in life, and then, "folding the drapery of his couch around him, lie down to pleasant dreams." But new blood is coursing through his veins. New ambitions are filling his mind, and stiring his energies, rejuvenating him, and causing him to cast off the lethargy of age. He yearns for the companionship of the gentler sex, and who can blame him who has once enjoyed the tender, gentle, affectionate solicitude and society of a good wife? Peradventure he looks not upon the elderly maiden ladies of his own age, but with longing eyes and palpitating heart

covets a young, strong and buxom helpmeet. But she is not for old and second-hand widowers, such as he, unless she can receive a goodly settlement as a balm for her youthful affections. The Al. Ward farm about fills the measure. He therefore, quelling any lingering qualms of conscience, undertakes to undo what he has so solemnly and legally done. He fears to approach his son Taylor on the subject, well knowing that he is a "chip of the old block," but secretly endeavors to make out a case of non-delivery; but, when he finds that this is a failure, he approaches Taylor with persuasive influence, and finally attempts to buy him out at a figure which Taylor refuses to accept. Taylor is disposed at times to be lenient towards his father and so expresses himself; but when he thinks of the object had in view, and the solemn manner in which he was invested with the property, in the presence of his dead mother, and that his father only wants the return of the property to buy some one to fill that mother's place, his whole nature rebels. The fires of mother love never die out in the breast of a dutiful son, and a niche is always kept in his heart for her who gave him birth and life, that no other can fill. The father, finding his son obdurate even against threats to kill him, seeks a court of equity; and the only allegation contained in his bill to invoke its assistance he abandons in his proof, and the only thing contained in his evidence that would entitle the court to interfere is the assertion that when he handed Taylor's wife the deed, he told her "to keep it for him until he called for it." To establish this reservation, the burden was on him, and in this he has entirely failed. The evidence and circumstances both heavily preponderate against him. And while a fellow feeling that he might marry the woman of his choice, which is now placated by the fact that he is already married, may appeal to the individual sympathies of the members of the court, yet such considerations can have no weight in the administration of abstract justice, according to the certain fixed rules governing courts of equity. In this case equity leaves the parties in the situation in which they have placed themselves by their solemn legal acts. To do otherwise would be to open the doors wide to any one who may hereafter, by a change of feelings, become dissatisfied with any writing obligatory, it matters not how formally

or carefully executed. *Lipscomb* v. *Love*, 38 W. Va. 546, (18 S. E. 732).

The counsel for the plaintiff insists that this case comes within the rule this Court has laid down in the case of *Smith* v. *Yoke*, 27 W. Va. 639, approved in *Bartlett* v. *Clearenger*, 35 W. Va. 720, (14 S. E. 273), and *Richardson* v. *Ralphsnyder*, 40 W. Va. 15, (20 S. E. 854). This rule is simply, in effect, as stated in the opinion of Judge Snyder in the first case (page 642): "When the testimony leaves the result in doubt, the Appellate Court ought not to reverse the decree." There is a growing impression prevailing to some extent among counsel that the Court has simply adopted this rule to avoid the examination of cases in which the testimony is conflicting. Such is far from the truth; but the Court means to say that if, after the most careful scrunity, the conflicting testimony leaves the case in such a pivotal condition that it is a matter of doubt as to which side ought to prevail, it becoming a mere matter of conjecture, this Court will not disturb the determination of the lower court, in obedience to another well-established rule, that the burden is on the appellant to affirmatively show error to his prejudice. But in no case does this Court refuse to weigh the testimony, however conflicting, and give the party the benefit thereof in whose favor it plainly preponderates.

In the case now under consideration the preponderance is clearly with the defendant, and for this reason the decree of the Circuit Court is reversed, and the bill is dismissed.

### On Rehearing.

The conclusion reached in this case is fully and completely sustained by the pleadings and evidence. That the plaintiff delivered the deed in controversy there cannot be even a plausible doubt. On its face it shows that it was intended for immediate delivery, in the use of the following words: "But it is expressly agreed, understood, and stipulated by the parties hereto that no title shall pass hereby to the land above described until after the death of the said Acquilla J. Ward, but said A. J. Ward shall retain and have exclusive possession, use, and control of said land until his death, when the same shall pass by

this conveyance unto the said Taylor Ward, as herein aforesaid." Why this strong stipulation, and how could it be accepted by the grantee until and unless the deed was delivered? That plaintiff afterwards endeavored to entrap the wife of the defendant into an admission of being his depositary is established beyond contradiction; and, if his counsel feel any irritation on account thereof, they should place the blame on their client, as he did on them. Equity requires a clear case and clean hands from those who ask its interposition. When these are wanting, prayer for relief will be unavailing.

The former decree of this court, reversing the decree of the circuit court, and dismissing plaintiff's bill, will be confirmed.

*Reversed.*