# CHARLESTON

## REEL *v.* REEL.

Submitted September 15, 1905.   Decided February 20, 1906.

1. TRUSTS—*Resulting Trusts.*
   One taking a deed for land knowing that another has a valid equitable title to the same land from the same vendor is held in equity as holding the legal title in trust for the benefit of the first purchaser, and equity will compel him to pass the legal title to such first purchaser. (p. 109.)

2. SPECIFIC PERFORMANCE—*Oral Contract as to Land.*
   An oral contract by a father to convey land to his son in consideration that he shall support the father, is not enforceable in equity, unless the possession has been transferred to the son under the contract. (p. 110.)

3. DEED—*Delivery.*
   Though the grantor tender to the grantee a deed with intent to deliver it, yet if the grantee refuse to accept it, it is not a perfected deed, and passes no title. (p. 111.)

Appeal from Circuit Court, Randolph County.

Bill by James Reel against William C. Reel and others. Decree for plaintiff, and defendants appeal.

*Reversed.*

BENT & SPEARS, for appellants.

TALBOTT & HOOVER, for appellee.

BRANNON, JUDGE:

James Reel filed a bill in equity in the circuit court of Randolph county against William C. Reel and Andrew Fansler, setting up that he was over fifty-one years of age and until the winter of 1903 had lived with his father and mother on the farm; that his mother was dead, and one of two sisters was dead, and the other was the wife of Andrew

Fansler; that the daughters, upon marriage, had left home, but he remained; that when twenty-one he told his father that he was going away from home to earn money for himself; that his father told him that he was his only son, and if he would remain at home with his father and mother and aid in supporting and caring for them, he would give all the lands he might own at his death to him, James Reel; that he and his father made a definite agreement to that effect, the father agreeing to convey the lands to him at his death; that in execution of the agreement he remained at home with his father and mother, and worked on the farm with his father, clearing land, cropping the land, building a house on it for the family, paying the taxes, and sometimes working elsewhere for wages, and devoting his earnings to the support of the family; that his father in the execution of said agreement went to Amos Canfield and had him to draw a deed conveying two tracts of land, one of thirty-one and one-half acres, the other fifty-six acres, to said James Reel, and signed and acknowledged it; that his father brought the deed home, and informed the plaintiff that he had placed said deed in a chest or drawer, and told plaintiff to take it and have it recorded, but as plaintiff seldom went to the county seat he left the deed where his father had placed it; that afterwards, 1st September, 1902, his father had conveyed to Andrew Fansler the same tracts in consideration of support and maintenance during life: that the deed was made and put on record, without the knowledge of the plaintiff; that Fansler was fully informed through years of the said agreement between William C. Reel and the plaintiff, and when he took the deed Fansler knew that William C. Reel had made the deed to the plaintiff, and had delivered it to him, though it had never been in the hands of the plaintiff or put on record; that Fansler had moved on the farm, driven plaintiff away, and was living on the farm with William C. Reel; that Fansler had fraudulently and corruptly induced William C. Reel to make the deed to him. The bill claims that the placing of the deed in the drawer was in law a delivery of it, and it sought to compel the defendants to surrender it to him, if in their possession, and if not, to compel them to convey the land to the plaintiff reserving a lien for the father's support; and if that could not be done, that the lands be

charged with $1,000 compensation for work and labor done and money spent by James Reel for his father, as a judgment for it would be unavailing against his father, as he was insolvent. William C. Reel and Fansler demurred to the bill for want of equity jurisdiction, and answered denying that James Reel had supported him. William C. Reel admitted that for a short time prior to the year 1900 he did propose to make his son a deed for the land in consideration of support of himself and his wife, and that for a time James Reel agreed to the proposition, and it was a mutual understanding that such deed would be made; but the answer averred that finally the plaintiff refused to accept any such deed for the support and maintenance of his father and mother. The answer stated that James Reel simply lived at home sharing in the product of the little farm along with other members of the family, until about the year 1900, when he, the father, did agree to convey to the son the land in consideration of such maintenance, but the son refused to consumate the agreement. The answer admits that on the 19th, January, 1900, William C. Reel did sign and acknowledge a deed whereby he intended to convey to his son the land; that he informed his son that he had made the deed and offered it to him, and his son declined to accept it, and never did accept it, and authorized his father to convey the land to Fansler, and authorized him to make the deed to Fansler which he did make. Fansler admits that when he took the deed for the land he was aware of the existence of the said deed to James Reel; but that before the deed was made to him, Fansler, James Reel had declined to accept said deed, had declined to assume the obligation of supporting his father and mother, and that James Reel got possession of the said deed from his father to him, and delivered it to Fansler, and urged him to undertake the support of his father and mother, and after hesitation, he, Fansler, agreed to do so, and accepted a deed for the land, which was executed with the full knowledge and consent of James Reel; that he took possession under this deed, paid back taxes on the land, and ever since had been complying with his obligation to support William C. Reel. Fansler filed the said deed to James Reel from his father, it being in his possession. A decree in the case declared that the deed from William C. Reel to James Reel had been delivered to

James Reel, and the deed being filed in the papers, it was decreed that the legal title to the land was in James Reel, and gave him leave to withdraw said deed and place it on record. The deed to Fansler was canceled as in fraud of the right of James Reel. William C. Reel and Fansler appeal.

Equity jurisdiction is denied because, on the theory of the bill, that the deed to James Reel was perfected by delivery, he could sue in ejectment, and being out of possession must sue at law and not in equity to remove a cloud, citing *Smith v. O'Keefe*, 43 W. Va. 172. If we held that the deed to James Reel was consummated by delivery, we must needs decide the question whether one holding legal title out of possession can sue in equity to remove a cloud arising from a second deed by the same grantor, taken with knowledge of the first; but we are of the opinion said deed was not perfected by delivery, which is an indispensable element in the elementary definition of a deed. Therefore, we have a suit in equity by one claiming to have first an oral contract for the conveyance of land by a father to a son on consideration of work and labor at home for the support of the father and his family, and then the contract evidenced by a deed executed in all respects except by delivery, and the bill seeking enforcement of such contract as against the father, or the right to enforce involved in the suit as a necessary element and seeking to annul a deed accepted by another person from the same vendor for the same land, with notice of the right of him claiming under such contract, and seeking its cancellation, or to compel him to pass the legal title by deed. I suppose it would be immaterial whether a decree of relief be to enforce the contract by compelling a deed from the father and cancelling the deed to Fansler, or compelling Fansler to pass the legal title to James Reel—the latter being the more usual mode of decree, simply treating him as holding title as a *quasi* trustee for James Reel. Surely, this state of facts presents a case of equity jurisdiction of frequent occurrence. Equity follows the legal title into the hands of its fraudulent holder, and makes him hold that title as held in trust, and compels him to execute the trust by conveyance. *Davis v. Settler*, 43 W. Va. 17. He takes the shoes of the vendor, and equity will make him do what it would have made the vendor do. 1 Beach, Mod.Eq. section 346; 2 Pomeroy, Eq.,

3 Ed., section 591.   It is a clear case of jurisdiction in equity.

Though I think it contrary to the weight of authority, yet under *Bowles* v. *Woodson*, 6 Grat. 78, and *Parrill* v. *McKinley*, 9 *Id.* 1, the undelivered deed would be good as a memorandum to answer the demand of the statute of frauds that a contract for sale of land be in writing, and we would have to say whether the mere oral contract would be enough. For myself I do not see why it is not just as requisite that the memorandum of the sale contract be delivered as that a deed be, and so I think say the authorities.   But I concede that these cases eliminate the question of a writing.   As we find that James Reel refused to accept the deed, repudiated it, it might be said that he would fall back on his oral contract.   No, because refusing to support his father, renouncing the contract, authorizing Fansler to assume the burden of his father's support, and take a conveyance, would operate to repudiate also the oral contract, and estop James Reel from claiming against Fansler.   I am, however, free to say, that the oral agreement is not enforceable by specific performance, as it was not executed by a transfer of possession. There was no change as to possession.   The contract was not to take effect by possession until the father's death.   The father remained in possession.   *Harrison* v. *Harrison*, 36 W. Va. 556; *Ratliff* v. *Somers*, 55 W. Va. 30.   As the oral contract is not good, James Reel can have no right as against his father.   Nor can he against Fansler, so far as that oral contract goes; for there was nothing in it, no vested right under it, with which to affect Fansler with notice.   *Central Land Co.* v. *Laidley*, 32 W. Va. 134.

A deciding question in the case is, Was that deed delivered to James Reel?  If so, it passed title, though not recorded, and Fansler having notice of it, would take no title by his deed.   On the other hand, if that deed was not delivered, James Reel got no title, and Fansler took good title.   This turns on evidence, and we cannot, ought not, enter into details.   The father seems to be an intelligent, plain country man, of seventy-eight years.   He swears that he talked several years of deeding the land to his son, and had a deed drawn and acknowledged, brought it home and said, "Says I to Jim here is the deed, and patted my hand on the deed, and says I it is no account to you till you take it and get it record-

ed. Says he I don't want the deed,—swore he wouldn't. have it." He repeats several times that the son declined to accept the deed, and cursed and abused him for making it. He swears that his son told him to convey the land to Fansler. He adds, "Says I to Jim if I make a deed to Fansler, says I, if I do this now the very first time you get out of humor, you will swear that I have no right to make it to him, and it was against his orders, and you get the least bit mad you will be for killing me, and may be will do it." This is the old man's statement reiterated in several forms during his examination. Fansler, Sallie Courtney and Sarah Wood were present and heard the conversation and pointedly confirm him. All four say he repeated at different times this refusal to accept the deed. All say that when the father and Fansler were about to start to Elkins to have the deed to Fansler written, James delivered his deed to Fansler, and consented to his father conveying the land to Fansler; and that when they returned in the evening with the deed he was informed that the deed had been made to Fansler, and approved it. He waited fifteen months before suing. It is argued that it is unreasonable to say that James Reel at the age of fifty-one would thus relinquish his life long home. Not so when we reflect that his father was an aged man, his power to labor gone, frail of body, somewhat fretful, and the son himself without means, coming to an age when his own power to labor was decreasing, he childless and wifeless. Who would perform the arduous housework which the assumption of this heavy burden of supporting his father, perhaps for many years in the feebleness of old age, would impose? Quite reasonable that James Reel would prefer that Fansler and his wife, the old man's daughter, should bear this heavy burden. James talked about going elsewhere. If he should do so, how could he take care of his father? As a matter of law, if the old man did deposit the deed in a chest giving leave to James to take it, that would be clear delivery; if he retained power and dominion over it, it was not. *Ward* v. *Ward*, 43 W. Va. 1; *Gaines* v. *Keener*, 48 *Id*. 56; *Adams* v. *Baker*, 50 *Id*. 249. But in this case, there was refusal to accept, a disaffirmance. It requires not only deliverance by the grantor to make a deed, but acceptance by the grantee. No matter how distinct the offer or words of delivery on the grantor's part,

if the deed is refused by the grantee, there is no deed. *Guggenheimer* v. *Lockridge*, 39 W. Va. 457. When a deed is for one's benefit, there is a presumption of acceptance, but why speak of that in the face of express rejection? James Reel's version is different, but inconsistent and unreasonable. He says that when his father brought his deed home he did not tell him it was a deed, but said "it was a little script of paper and put it in the chest. I never seen it. He said to take it and put in the clerk's office. I can neither read nor write." How unreasonable! Is it probable his father would call it a "script" of paper? And is it reasonable that James Reel could believe it to be a script of paper when his father told him to take it to the clerk's office? But his bill does not hint that his father called it "a script," as it pointedly says that his father got Canfield to write "a deed conveying to plaintiff the thirty-one and one-half acres and fifty-six acres of land, and after the deed was written it was signed by William C. Reel, acknowledged, and said Reel brought the deed from the residence of said Canfield to the residence of said Reel, and when he came home he informed plaintiff that he had placed said deed in a chest and told plaintiff to take it and have it placed on record." Utterly inconsistent with his statement that he did not know it was a deed. He admits that Canfield told him that it was a deed for the land. He told Eevertt that his father had made him a deed. Also he told Canfield that his father had so informed him. All this shows that he knew it was a deed. And he pointedly swears as to that paper, that he did *not accept* it. The defense in volume and force of testimony has the better of the case greatly. Therefore, the deed in question never took effect.

As to the claim for a lien on the land for work and labor, I know of no law to create it, none is shown.

Decree reversed and bill dismissed.

*Reversed and Dismissed.*