BONNIE KEE *et al. v.* JOHN SIMMONS *et al.*

(No. 8639)

Submitted April 27, 1938. Decided June 28, 1938.

*Grover F. Hedges* and *Thomas P. Ryan,* for appellants.
*Harper & Baker* and *S. P. Bell,* for appellees.

HATCHER, JUDGE:

This is a suit to partition equally among the eight surviving children of F. M. Simmons, deceased, his real estate, consisting of more than 800 acres. His only son, John, filed a cross-bill claiming exclusive title to an area of 250 acres by virtue of an alleged verbal understanding had with F. M. in 1927. The circuit court found in favor of John.

The understanding, as stated in the cross-bill, was that John should move to and live in the residence of F. M. and there "furnish" him "a home" and care for him the remainder of his life, for which F. M. would "sell" John the 250 acres, exclusive of oil and gas. The cross-bill further alleged that John moved on the property forthwith, assumed sole possession and made valuable permanent improvements on it, and cared for F. M. until his death in 1934.

John's only testimony as to the agreement was on cross-examination. Upon being asked why he moved to his father's farm, he replied: "I moved over with the understanding that I was to get the farm in the trade * * * 250 acres of it * * * the home farm. * * * I was to get what was on the left hand side of Spring Creek, with the exception of a small tract of land at the mouth of Tom's Run for a right of way". A surveyor testified that in 1929, F. M. said he had agreed to give John the "Goff", the "Harper" and the "Heaton" tracts—"not quite all the Heaton tract * * * "—for taking care of him his lifetime, and would let the surveyor know when to survey the tracts; that August 14, 1934, the survey was made under the direction of F. M., who then handed the

calls prepared by the surveyer to John, saying " * * * here are your calls to make your deed from * * * ." John had a deed prepared according to the calls, but F. M. died August 16, without executing it, because, according to John, the oil and gas had not been excepted. Several neighbors testified, respectively, to having heard F. M. say subsequent to 1927 (a) that he had made a trade with John, who was to have "the home farm if he would move and live with him the rest of his days"; (b) that he "was going to turn over that side of the farm (from the road) to John"; (c) that he "had turned this side of the road over to John"; (d) that he "had turned the place over to John"; (e) that a "bunch of timber" on the same side of the farm as the house "belonged to John"; and (f) that he "intended for John to have what was on yon side of the creek." The term "home farm" or "home place", as thus used, is ambiguous. The term originally applied to the Harper tract of 125 acres, which F. M. inherited; later the term was used sometimes with reference to that tract and sometimes with reference to that and adjoining lands.

John moved to the residence of F. M. in 1927 and thereafter, seemingly rendered him such personal service as he needed. John directed the making of several permanent improvements on or near to the residence which he said were paid for with his own money; some of the payments being made, he said, with his "individual check". He did not produce any of such checks. The record shows conclusively that some payments on the improvements were made by checks to which John had signed the name of F. M. (with the latter's permission); also that a number of payments to the hired help—particularly the domestic help—were made in the same manner; that these checks, cancelled, were last seen in the possession of John and that he would not comply with a demand to produce them. He did not deny stating to one of the plaintiffs that F. M. had bought him an automobile and had also paid hospital bills for his wife approximating $700.00. John testified (in effect) that in

1927 he took, and has since exercised open and exclusive possession of the 250 acres and appropriated to his own use the proceeds thereof. This testimony is discounted by the following undisputed facts. (1) His sisters, though in touch with John every now and then between 1927 and 1935, never heard of his claim of ownership. until he filed his cross-bill herein. (2) John, desiring a water well on the 250 acres, referred the driller to F. M. Afterwards, the driller said he made an agreement with both John and F. M. to drill the well. (The driller's memory was elusive as to which one paid him.) (3) In June, 1934, a cooperative federal soil erosion contract, relating to a part of the 250 acres, was signed by F. M. as "owner" and by John as "operator"; and John attempted to have his sisters pay one-eighth each of the cost of "putting out the farm erosion stuff". (4) Within a few days after F. M.'s death, John accepted a written agreement signed by all of his sisters, giving him "all of their undivided interest in all the corn crops, hay crops, two horses, all household goods and kitchen furniture now located on the late F. M. Simmons' farm * * * ." About one-half of the corn and hay referred to was raised on the 250 acres. (5) At the same time, the sisters agreed with John that he should have the family residence, and acreage surrounding it "in proportion to what the rest of us would get. * * * He seemed to be well pleased". (6) And on that occasion, he did not assert any specific claim to the 250 acres, or mention any contract with F. M. relative thereto. John would explain later attempts by him to purchase the interests of several of his sisters in the entire Simmons' land by the fact that two weeks after F. M.'s death, he was advised by an attorney that his agreement with F. M. was not enforceable. But the conference with his sisters above mentioned occurred before he consulted the attorney.

The "loose declarations" of F. M. in John's favor about the home farm, etc. are not sufficient. *Harrison* v. *Harrison*, 36 W. Va. 556, 15 S. E. 87; *Moss* v. *Moss*, 88 W.

Va. 135, 106 S. E. 429. Neither the testimony of John as to the understanding with F. M. in 1927, nor that of the surveyor of what F. M. said about it in 1929, refers to the oil and gas, or otherwise defines the terms of the contract with the certainty equity contemplates. *Miller* v. *Lorentz,* 39 W. Va. 160, 19 S. E. 391. Transfer of possession to the son is essential to the validity of a contract such as this. *Reel* v. *Reel,* 59 W. Va. 106, 52 S. E. 1023; *Goodwin* v. *Bartlett,* 43 W. Va. 332, 27 S. E. 325. Even if the terms of the understanding be taken as definite, John's possession of the 250 acres was not of the character requisite to support specific performance. "Possession, to entitle a person to specific execution of a parol contract, must be actual, notorious, and exclusive." *Woods* v. *Stevenson,* 43 W. Va. 149, 27 S. E. 309. John signally failed to pose continuously as "the ostensible and exclusive proprietor" of the 250 acres. Without this attitude his possession was unavailing. *Gallagher* v. *Gallagher,* 31 W. Va. 9, 5 S. E. 297. John's seeming unrestricted use of F. M.'s bank deposits, and the benefits John and his family received from F. M.'s generosity, discountenance the idea that refusal to complete the contract would be a hardship on John.

The finding in favor of John's specific claim to the 250 acres is reversed, and his cross-bill is dismissed.

*Reversed.*